**Robert Lee ALLEN, Plaintiff,**

v.

**MINNESOTA LIFE INSURANCE Company, Defendant.**

No. 99–CV–1610.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 28, 2001.

**1378**

Kevin Quirk, Quirk & Quirk, Atlanta, GA, for Plaintiff.

Tommy T. Holland, John Lowell McKinley, Jr., Carter & Ansley, Atlanta, GA, for Defendant.

## ORDER

FORRESTER, District Judge.

This matter is before the court on cross motions for summary judgment.

## I. STATEMENT OF THE CASE

### A. *Procedural History*

Plaintiff, Robert Lee Allen, filed the instant action in the Superior Court of Ful-ton County, Georgia on April 30, 1999. Plaintiff alleges that Defendant, Minnesota Life Insurance Company, breached a contract by terminating benefits to Plaintiff under an insurance policy issued by Defendant. Plaintiff further alleges that Defendant acted in bad faith. In addition to damages, Plaintiff seeks declaratory relief, attorney fees, and costs. Invoking this court's diversity jurisdiction, Defendant removed the case to this court pursuant to 28 U.S.C. §§ 1441 and 1446 on June 21, 1999. Following discovery, the parties filed the instant motions for summary judgment.

### B. *Facts*[1]

Plaintiff received his medical degree from the Medical College of Virginia in 1989. After receiving his degree, Plaintiff then participated in a postdoctoral residency in anesthesiology at Emory University School of Medicine in Atlanta. While participating in this residency, Plaintiff purchased a Disability Income Policy from Defendant.[2] The policy provided a monthly income benefit through August 17, 2027 should Plaintiff "suffer a period of disability due to sickness or injury which extends beyond the waiting period," which was 90 days. (*Id.* at RLA 2160–61, 2167). The policy defined "disability" as follows: "You have a disability if, because of continuing sickness or injury, you: (1) are under the regular, reasonable and customary care of a physician; and (2) are unable to engage in your regular occupation...." (*Id.* at RLA 2166). The policy defined "regular

---

1. The following facts are taken from the parties' statements and responses, as provided for in Local Rule 56.1B, N.D.Ga., as well as evidence in the record. Those of the parties' statements or responses that constitute issues or legal conclusions are not considered. *See* LR 56.1B(1), N.D.Ga.

2. The policy was actually issued by Defendant's predecessor, Minnesota Mutual Life Insurance Company.

occupation" as "[t]he primary income-producing duties you engage in at the time you become disabled." (*Id.*). Additionally, the policy provided that Plaintiff was "unable to engage in your regular occupation when because of continuing disability you are earning not more than 30% of your prior average earned income from your regular occupation." (*Id.* at RLA 2166). It is undisputed that Plaintiff was insured as an anesthesiologist under the policy.

After completing the residency program at Emory and passing written anesthesiology board examinations, Plaintiff began practicing anesthesiology. In May 1994, Plaintiff was hired as a Staff Anesthesiologist at Anesthesia Associates of Hampton, Ltd. ("Associates"), located in Virginia. In that position, Plaintiff enjoyed staff privileges at Sentara Hampton General Hospital ("Sentara"). In June 1994, shortly after commencing his employment with Associates, Plaintiff began abusing Fentanyl. Fentanyl is a Schedule II controlled substance typically used in operating rooms to control pain. In addition to relieving pain, however, Fentanyl provides the user with a sense of euphoria, sedation, and freeness. It also causes a craving for the drug as the effects of the medication wear off. During the period from June 1994 to August 17, 1994, Plaintiff used Fentanyl between six and twelve times. (Allen Depo., pp. 31, 37–39). Toward the end of this period, Plaintiff was using the drug in intervals of approximately forty-eight hours. (*Id.* at 39). It is undisputed that Plaintiff's use of Fentanyl had at this point become an addictive disorder.[3]

In late August 1994, Plaintiff was requested to attend a meeting at work, where police officers and officials from the Virginia Board of Medicine were waiting. Plaintiff was apparently questioned about missing quantities of Fentanyl and was unable to offer an adequate explanation. On or about August 25, 1994, Sentara suspended Plaintiff's staff privileges pending an investigation of a possible diversion of a Schedule II controlled substance. On that same date, Plaintiff submitted to a toxicology screen of his urine, which tested positive for Fentanyl. The Virginia Board of Medicine summarily suspended Plaintiff's license to practice in Virginia on September 1, 1994, and Plaintiff was admitted to the William J. Farley Institute for Recovery ("Farley") the next day. Plaintiff's admission diagnosis included opiate dependence. Plaintiff resided at Farley and received treatment until his discharge on November 23, 1994. Plaintiff's final diagnosis included opiate dependence, alcohol dependence, and depressive disorder. Nonetheless, his prognosis for recovery was considered good, provided that he strictly adhere to a relapse prevention plan and a continuing care plan. After his discharge from Farley, Plaintiff entered into an Aftercare Agreement with the Medical Society of Virginia's Physicians Health and Effectiveness Program, and he continued outpatient treatment at Farley.

On November 20, 1994, while he was still in treatment at Farley, Plaintiff submitted a claim for benefits under the Disability Income Policy he had purchased from Defendant. On the claim form, Plaintiff indicated that his disability was "chemical dependency (opiate) & depression," and that the sickness started on August 25, 1994. (Def. Ex. B). In Janu-

---

3. During this same period, Plaintiff also used Toradal, a non-steroidal medication without narcotic effect. (Allen Depo., p. 33).

ary 1995, Dr. Eric B. Hedberg, Plaintiff's treating physician at Farley, completed a statement of disability for Plaintiff. Dr. Hedberg's statement indicated that Plaintiff suffered from opiate dependence and was unable to perform his regular work. (Def.Ex. C., pp. 1–2). The statement also indicated, with regard to physical impairment, that Plaintiff had "[n]o limitations of functional capacity; capable of heavy work; no restrictions." (Def.Ex. C., p. 1). The statement further indicated, with regard to mental impairment, that Plaintiff "is able to function under stress and engage in interpersonal relations (no limitations)." (*Id.* at 2). Finally, in answering whether he expected a fundamental or marked change in the future relating to Plaintiff's job, Dr. Hedberg marked "Yes—Improvement." (*Id.*).

On March 7, 1995, the Virginia Board of Medicine indefinitely continued the suspension of Plaintiff's license, although it stayed the suspension upon certain conditions. One of these conditions was that Plaintiff's medical practice be confined to a residency or fellowship program approved by the Board. Additionally, Plaintiff was not to prescribe, dispense, or administer any Schedule II controlled substances.

Plaintiff began a residency program in internal medicine in May 1995. Shortly after beginning this residency, complaints arose that Plaintiff was administering narcotics to patients and tests showed the possible presence of blocking agents in Plaintiff's urine samples. Plaintiff, however, never used any blocking agents. (Allen Depo., p. 57). The monitoring physician assigned to Plaintiff through the Aftercare Agreement recommended that Plaintiff return to Atlanta for treatment at the Talbott Marsh Recovery Center ("TMRC"). TMRC typically treats individuals who

have not successfully recovered despite treatment in other programs. It is undisputed, however, that Plaintiff has not used either Fentanyl or alcohol since August 17, 1994, and he specifically testified that he had not used any drugs or alcohol during the period of his treatment. (*Id.* at 39, 50–51).

Plaintiff was admitted to Anchor Hospital in Atlanta, a companion facility to TMRC, on June 12, 1995. As with his earlier stay at Farley, Plaintiff's admission diagnosis included opiate dependence. After four days at Anchor Hospital, Plaintiff was transferred to TMRC, where he received in-patient treatment throughout the summer and early fall of 1995. Plaintiff was discharged from TMRC on October 7, 1995. On November 8, 1995, Dr. Philip O. Wilson, Plaintiff's treating physician at TMRC, completed a statement of disability for Plaintiff. Like that of Dr. Hedberg several months earlier, Dr. Wilson's statement indicated that Plaintiff suffered from opiate dependence and was unable to perform his regular work. (Def.Ex.D, pp. 1–2). Also like Dr. Hedberg, in answering whether he expected a fundamental or marked change in the future relating to Plaintiff's job, Dr. Wilson marked "Yes—Improvement." (*Id.* at 2).

Plaintiff began another residency in internal medicine at Georgia Baptist Hospital in Atlanta in early 1996, and he was offered a position as an internal medicine physician at the Fayette Medical Clinic ("Fayette Medical") in the fall of 1997. On October 23, 1997, the Virginia Board of Medicine terminated Plaintiff's suspension and returned his license to full and unrestricted status. On December 5, 1997, the Georgia Composite State Board of Medical Examiners, which had previously stayed suspension of Plaintiff's Georgia license on

conditions similar to those imposed by Virginia, similarly reinstated Plaintiff's license to full and unrestricted status. Plaintiff commenced full-time practice as an internal medicine physician at Fayette Medical in January 1998. Plaintiff is board certified in internal medicine. Although Plaintiff can prescribe drugs as an internal medicine physician, he does not administer or handle medications.

From November 1994 through the end of 1997, Defendant paid disability benefits to Plaintiff under the Disability Income Policy. By letter dated March 12, 1998, however, Defendant informed Plaintiff that he would receive no benefits beyond January 1, 1998. There is no physical or mechanical limitation on Plaintiff's ability to practice anesthesiology, nor is there any legal restriction on his ability to practice anesthesiology. Plaintiff has not practiced as an anesthesiologist since 1994, nor has he attempted to become employed as an anesthesiologist since the reinstatement of his licenses. (Allen Depo., p. 68). He has, however, spoken with his physicians about the possibility of returning to that field and has been advised that it would not be in his best interests to do so. (*Id.* at 68–70). Plaintiff continues to receive treatment from TMRC on an out-patient basis. Plaintiff's treatment plan includes individual sessions with Dr. Wilson, attendance at Alcoholic Anonymous meetings, attendance at physician group meetings, and random urine drug screening. In a letter to Defendant dated January 7, 1998, Dr. Wilson indicated his belief that Plaintiff was disabled to practice anesthesiology, and his opinion had not changed by the time of his deposition in November 1999. (Wilson Depo., p. 50, Ex. 1).

## II. DISCUSSION

Plaintiff moves for summary judgment on the ground that he is disabled as defined under the Disability Income Policy ("policy"), is thus entitled to benefits, and is entitled to judgment for Defendant's breach of contract in discontinuing such benefits. Defendant similarly seeks summary judgment on the issue of Plaintiff's disability, arguing that he is not disabled as defined under the policy and is therefore not entitled to benefits. Additionally, Defendant asserts that benefits are not due under the policy because Plaintiff's illness manifested itself prior to the effective date of the policy. For the following reasons, the court concludes that Defendant is entitled to summary judgment.

The parties dispute whether Plaintiff is entitled to benefits under the policy by virtue of his addiction. "Contracts of insurance are governed by the same rules of interpretation as apply to other contracts...." *Golden v. National Life & Accident Ins. Co.,* 189 Ga. 79, 87, 5 S.E.2d 198 (1939); *see also Park 'N Go of Georgia, Inc. v. United States Fid. & Guar. Co.,* 266 Ga. 787, 791 n. 8, 471 S.E.2d 500 (1996) (identifying "ordinary rules of contract construction" as those found in O.C.G.A. § 13–2–2, *et seq.*). The construction of a contract constitutes a question of law for the court, although the jury must find any questions of fact involved in construing the contract. O.C.G.A. § 13–2–1. The cardinal rule of construction is to ascertain the intent of the parties. O.C.G.A. § 13–2–3; *Golden,* 189 Ga. at 87, 5 S.E.2d 198. When the contractual terms are clear and unambiguous, the court is to look to the contract alone to find that intent. *See, e.g., Park 'N Go,* 266 Ga. at 791, 471 S.E.2d 500. "Terms in an insurance policy are given their ordinary and common meaning, unless otherwise defined in the contract." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 328, 498 S.E.2d 492 (1998). When the terms

are ambiguous, the statutory rules of construction apply, and pursuant to those rules, the contract will be construed against the insurer and in favor of the insured. *See* O.C.G.A. § 13–2–2(5); *Hurst v. Grange Mut. Cas. Co.*, 266 Ga. 712, 716, 470 S.E.2d 659 (1996).

The policy at issue in this case provides that Plaintiff, as the insured, "will receive the monthly income benefit if [he] suffer[s] a period of disability due to sickness...." (Def.Ex. A., p. RLA 2167). Plaintiff will be deemed to suffer a disability if he is both "under the regular, reasonable and customary care of a physician" and "unable to engage in [his] regular occupation." (*Id.* at RLA 2166). It is undisputed that, as part of his out-patient treatment with TMRC, Plaintiff is under "the regular, reasonable and customary care" of Dr. Wilson. Plaintiff therefore satisfies the first part of "disability" as defined in the policy.

■ The point of contention between the parties concerns the second part of the policy's definition of "disability": whether Plaintiff is unable to engage in his regular occupation. The policy provides that Plaintiff is "unable to engage in [his] regular occupation when because of continuing disability [he is] earning not more than 30% of [his] prior average earned income from [his] regular occupation." ˙ (*Id.* at RLA 2166). The first phrase of this provision—"unable to engage in"—is unambiguous. Because the policy does not define these terms, the court turns to their ordinary and common meanings. The ordi-

nary and common meaning of "unable" as used in this provision means "incapable," *Webster's Third Int'l Dictionary* 2481 (1981), and "engage" means "to employ or involve oneself in." *Id.* at 751. The phrase "unable to engage in" accordingly means "incapable of employing oneself in."

■ The second phrase of this provision—"[his] regular occupation"—is likewise unambiguous. The policy defines regular occupation as "[t]he primary income-producing duties [the insured] engage[s] in at the time [he] become[s] disabled." (*Id.* at RLA 2165). It is undisputed that Plaintiff was insured as an anesthesiologist under the policy, and the practice of anesthesiology therefore constitutes his "regular occupation" as defined in the policy.[4]

Construing the next phrase—"because of continuing disability"—proves a bit more problematic, although ultimately this phrase is also unambiguous. At the heart of the problem is the policy's definition for the term "disability." As demonstrated, the policy defines "disability" as a two-part process: (1) regular treatment by a physician; and (2) inability to engage in one's regular occupation. Applying this definition to the phrase at issue, however, leads to a circular result. The phrase "because of continuing disability" is part of the policy's explanation of when the Plaintiff is "unable to engage in [his] regular occupation." If the contractual definition of "disability" was used to interpret this phrase, the policy would essentially explain Plain-

---

4. The court notes that the instant policy is an occupational policy, providing "for indemnity if the insured is disabled from transacting duties pertaining to the particular occupation in which the insured is then engaged," rather than a total disability policy, "which provides for indemnity if the insured is disabled or prevented from engaging in any occupation and performing any work for compensation or profit." *Mutual Life Ins. Co. v. Barron*, 198 Ga. 1, 5–6, 30 S.E.2d 879 (1944). Because the policy is an occupational policy, to recover benefits, Plaintiff need show only that he is "disabled to follow that particular occupation, without regard to his ability to do other kinds of work." *Id.* at 7, 30 S.E.2d 879.

tiff's inability to engage in his regular occupation by referring to Plaintiff's inability to engage in his regular occupation. Such an explanation amounts to no explanation at all and would render the entire provision superfluous. Because the court is to construe the contract, if possible, in a manner that gives effect to each provision, *see* O.C.G.A. § 13–2–2(4), the proper use of the phrase "because of continuing disability" cannot be discerned by looking to the policy's definition of "disability."

■ In construing "because of continuing disability," then, the court turns to the ordinary and common meaning of the words. The term "continuing" generally means "uninterrupted." *Webster's Third New Int'l Dictionary* 493–94 (1981); *Black's Law Dictionary* 316 (7th ed.1999). The term "because of" ordinarily means "by reason of" or "on account of." *Webster's Third New Int'l Dictionary* 194 (1981). According to the definition most relevant to the instant dispute, "disability" means "the inability to pursue an occupation or perform services for wages because of physical or mental impairment." *Id.* at 642. Putting these meanings together, the phrase "because of continuing disability" means "by reason of an uninterrupted inability to pursue an occupation due to a physical or mental impairment." The court concludes that this construction best comports with a layman's understanding of the phrase at issue and exemplifies the parties' intent with regard to that phrase.

Looking at the meanings of the phrases just discussed, it becomes apparent that Plaintiff must be incapable of employing himself in the practice of anesthesiology to satisfy the policy's definition of "disability." It is equally apparent that, pursuant to the terms of the policy, Plaintiff is considered incapable of employing himself in the practice of anesthesiology when, by reason of an uninterrupted inability to pursue anesthesiology as an occupation due to physical or mental impairment, he earns no more than 30% of his prior average income from the practice of anesthesiology.

Having thus determined the meaning of the requirement that Plaintiff be "unable to engage in [his] regular occupation," the court must now decide whether the undisputed evidence demonstrates, as a matter of law, that Plaintiff does or does not fall within the criteria outlined. With regard to the criterion regarding Plaintiff's earnings from the practice of anesthesiology, it is undisputed that Plaintiff has not practiced anesthesiology since 1994. As such, there is no question that Plaintiff does not earn more than 30% of his prior average income from the practice of anesthesiology, and he satisfies this criterion.

■ The court concludes, however, that Plaintiff cannot satisfy the requirement concerning an uninterrupted inability to pursue anesthesiology due to physical or mental impairment. First, it is undisputed that Plaintiff suffers from no physical or mechanical limitations on his ability to practice anesthesiology. Second, although Plaintiff's treating physician testified that he had not changed his opinion that Plaintiff was disabled to practice anesthesiology, his deposition reveals that this opinion is based on future potentialities rather than any present impediment to Plaintiff's return to that field. Dr. Wilson testified that he recommends that most of his patients return to anesthesiology after treatment for drug addiction (Wilson Depo., p. 49), indicating that drug addiction does not itself disable someone from practicing in that field. Dr. Wilson further testified that Plaintiffs own fear of relapse, his pre-

vious history of "relapse behavior," and his "demonstrated inability to follow directions" raises the potential for relapse if Plaintiff were to return to the practice of anesthesiology. (*Id.* at 50–55, 58–59). Because of this potential for relapse, Dr. Wilson "see[s] no basis for him going back to practice anesthesiology" and believes that remaining away from anesthesiology is a part of Plaintiff's recovery process. (*Id.* at 53, 59). In short, Dr. Wilson testified that a return to anesthesiology is best avoided because Plaintiff used opiates in the past and there is a possibility that he may use them in the future. This testimony, however, does not demonstrate an existing impediment to Plaintiff's return to anesthesiology. It is undisputed that Plaintiff has not used any drugs or alcohol in more than six years, and there is no evidence that he would inevitably regress by virtue of a return to the practice of anesthesiology. As such, Plaintiff has not shown an *uninterrupted* inability to pursue the practice of anesthesiology due to his chemical dependence and does not fall within the policy's definition of "disability." The court therefore GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for summary judgment.[5]

## III. CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for summary judgment [14–1] and GRANTS Defendant's motion for summary judgment [16–1].

---

5. In light of this decision, the court need not address Defendant's argument that Plaintiff's illness manifested itself prior to the effective date of the policy.