GAIDRY, J.
| ¡¡This is an appeal by the plaintiff, R. Lee Berry, M.D. (Dr. Berry), of a summary judgment granted in favor of the defendant, The Paul Revere Life Insurance Company (Paul Revere). That judgment dismissed the plaintiffs claims, finding that the two disability policies issued by the defendant to the plaintiff do not provide coverage for his claimed disability of drug addiction.[1] For the following reasons, we find the trial court erred in granting Paul Revere’s motion for summary judgment, as there remain genuine issues of material fact. For the same reason, we affirm the trial court judgment denying Dr. Berry’s motion for summary judgment. Accordingly, we reverse in part, affirm in part, and remand.
BACKGROUND FACTS
The facts leading up to Dr. Berry’s claim for disability are generally undisputed. The plaintiff was a resident in anesthesiology in the early 1990s in Arizona. After completing his residency, he practiced as a board-certified anesthesiologist from 1996 through November 2002.[2] During that time, and culminating in November 2002, at the age of 35, Dr. Berry became addicted to prescription drugs, primarily Demerol, available to him in his practice in Covington, Louisiana. As a result, he left that medical practice in March 2001. According to Dr. Berry, he discontinued his abuse of Demerol for approximately |3one year, at which time he began working as an anesthesiologist in the state of Washington.
Dr. Berry began abusing Demerol again in the fall of 2002. On November 12, 2002, while employed in Washington, Dr. Berry attended a tubal ligation procedure while allegedly under the influence of Demerol. He was further alleged to have committed malpractice which rendered the patient under his care in a permanent vegetative state. Following this incident, he was investigated and found to have diverted narcotics from patients in five different cases. Immediately following that investigation, Dr. Berry entered the Primary Intensive Treatment portion of the Hazelden Spring-brook program in Portland, Oregon. Following the completion of the initial phase of treatment at Hazelden, Dr. Berry re *387 turned to Louisiana in January 2003 and began treatment with the “Addictive Behavior Unit” at Ochsner Clinic Foundation, and continues to date under the care of a “treatment team” of Dr. Eileen Correa, a psychologist, and Dr. Dean Hickman, a psychiatrist, both specialists in addictive disease. According to Dr. Berry, he also attends Alcoholics Anonymous (AA) meetings two to three times a week and has been drug free since November 15, 2002.
As a result of the Washington incident and further investigations, Dr. Berry’s medical licenses in Arizona, Washington, and Louisiana were suspended. The Louisiana State Board of Medical Examiners Consent Order, rendered in February 2005, specifically prohibits Dr. Berry from practicing in the field of anesthesiology. It further prohibits him from prescribing, dispensing, or administering a large variety of medications and from practicing in the fields of pain management, involving the use of controlled substances. Pursuant to the consent order, the prohibitions are to last “for the remainder of his medical career.”
| ..PROCEDURAL BACKGROUND
In January 2003, Dr. Berry filed claims for disability benefits pursuant to two separate policies he had through the defendant insurer, Paul Revere. Paul Revere paid him full disability benefits under both policies for approximately two and a half years, from March 2003 through August 2005, when it deemed him to be no longer presently disabled under the terms of the policy. At the time that Paul Revere discontinued paying disability benefits, Dr. Berry had been drug free since November 15, 2002, was in continuous rehabilitative treatment, and had no license to practice anesthesiology in the State of Louisiana (his covered occupation).
On April 5, 2006, Dr. Berry filed a petition for damages against Paul Revere, claiming that his addiction to prescription medications rendered him permanently and totally disabled from the practice of anesthesiology, because resuming his practice would require him to handle a great variety of narcotic and other controlled substances, in turn, increasing his risk of relapse. Dr. Berry alleged that Paul Revere was arbitrary and capricious in terminating his benefits, thereby entitling him to recover the full benefits under both policies, as well as statutory penalties, interest, costs, and attorney’s fees.
In May 2007, Dr. Berry filed a Motion for Summary Judgment, or alternatively, for Partial Summary Judgment, declaring that he is totally disabled from his occupation under the terms of both disability policies for the remainder of his life. He also sought judgment ordering the payment of benefits from September 1, 2005 (the date after benefits were terminated) through the date of the judgment,[3] together with legal interest from the date due until paid. Finally, he prayed for judgment also ordering payment of the present value of all future benefits due under the two policies,'[4] together with legal interest from the date of | fithe breach of the contract (August 31, 2005), the date benefits were terminated, until paid. Dr. Berry also alleged that Paul Revere was in bad faith and without just and reasonable grounds for terminating benefits and therefore sought statutory penalties pursuant to La. R.S. 22:657, in the amount of double the value of all past due benefits, which the plaintiff asserted to be *388 $242,970.00 on June 13, 2007, together with costs and reasonable attorney’s fees.
The trial court denied Dr. Berry’s motion. Paul Revere subsequently filed its own motion for summary judgment asserting that there are no genuine issues of material fact and that the plaintiffs risk of relapse does not constitute a present total disability as defined and provided for in the policies at issue. Therefore, according to the defendant, Dr. Berry is not entitled to benefits, and Paul Revere is entitled to judgment in its favor, dismissing his claims with prejudice.
The trial court granted Paul Revere’s motion and dismissed plaintiffs claims in a judgment dated October 24, 2007. Dr. Berry appeals that judgment.
STANDARD OF REVIEW
An appellate court reviews the district court’s decision to grant or deny a motion for summary judgment de novo using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate. Boudreaux v. Vankerlchove, 07-2555, p. 5 (La.App. 1st Cir.8/11/08), 993 So.2d 725, 729-30.
SUMMARY JUDGMENT
A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). Summary judgment is favored and shall be construed to secure the just, speedy, and inexpensive determination of every action. La. C.C.P. art. 966(A)(2).
| (iThe initial burden of proof remains with the mover to show that no genuine issue of material fact exists. However, if the mover will not bear the burden of proof at trial, he need not negate all essential elements of the adverse party’s claim, but -he must point out that there is an absence of factual support for one or more elements essential to the claim. La. C.C.P. art. 966(C)(2). Once the mover has met his initial burden of proof, the burden shifts to the non-moving party to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial. Samaba v. Rau, 07-1726, p. 5 (La.2/26/08), 977 So.2d 880, 883. The plaintiff may not rest on mere allegations or denials, but must set forth specific facts that show that a genuine issue of material fact remains. If the plaintiff fails to meet this burden, there is no genuine issue of material fact, and the defendant is entitled to summary judgment as a matter of law. Bd. of Supervisors of La. State Univ. v. Louisiana Agr. Fin. Auth., 07-0107, p. 9 (La.App. 1st Cir.2/8/08), 984 So.2d 72, 79-80.
As mover, Paul Revere bore the burden of proving that no genuine issue of material fact remains regarding Dr. Berry’s disability status, and that it is entitled to judgment in its favor as a matter of law.[5] Since Dr. Berry would bear the burden of proving entitlement to benefits at trial, Paul Revere need only show the absence of factual support for one or more elements of Dr. Berry’s claim for benefits.
ARGUMENTS
The sole issue in this appeal is whether Dr. Berry is entitled to disability benefits, a determination that is controlled by the *389 policy language and the facts herein. Both policies in relevant part provide:
1.6 “Sickness” means sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force.
|71.7 “Physician” means any licensed practitioner of the healing arts practicing within the scope of his or her license. A Physician must be a person other than You.
1.8 “Physician’s Care” means the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability.
1.9 “Your Occupation” means the occupation or occupations in which You are regularly engaged at the time Disability begins.
1.10 “Total Disability” means that because of Injury or Sickness:
a. You are unable to perform the important duties of Your Occupation; and
b. You are receiving Physician’s Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician’s Care would be of no benefit to You.
It is undisputed by the parties that addiction is a “sickness or disease” within the meaning of the policy, and that it first manifested itself while the policy was in force. The issue turns on whether the addiction, during or after a period of rehabilitation, renders a claimant “unable to perform the important duties” required of an anesthesiologist, given that there is an ever-present risk of relapse, and whether the “Physician’s Care” is appropriate for the condition causing the disability.
Paul Revere maintains that Dr. Berry is not currently disabled under the terms of the policies, based on his years of sobriety, current rehabilitated condition, and continuous ongoing treatment by his physicians. Paul Revere further argues that at the present time, Dr. Berry has the knowledge and capability of performing the substantial functions of an anesthesiologist, and the risk that he may relapse, no matter how high, does not render him disabled from performing his occupation at the present time. Moreover, it contends, his return to the practice, although giving him access to controlled substances, does not automatically render him addicted. Paul Revere contends it would take affirmative action on Dr. Berry’s part, i.e., diverting those drugs for his own personal use or abuse, for him to become disabled and unable to perform the duties of his occupation; however, Dr. Berry Rwould not be disabled if or until that happened. In short, Paul Revere maintains that the risk of relapse into addiction alone is insufficient to render him permanently disabled, when, in a sober and rehabilitated condition, he could practice his profession.
Dr. Berry, on the other hand, maintains that his addiction, and the risk of his relapsing should he have access to the controlled substances he has a history of abusing, renders him disabled for the rest of his life under the terms of the policy. Dr. Berry relies on the expert medical opinions of both of his treating physicians that he should never return to the practice of anesthesiology, where the drugs are readily accessible, because it subjects him to a high risk of relapse. Dr. Berry further argues that the loss of his medical licenses, prohibiting him from engaging in his occupation as an anesthesiologist, legally disables him from practicing. Dr. Berry contends that such legal disability is covered within the terms of the policy, because the license suspensions were a direct result of his addiction or sickness. On either basis, Dr. Berry claims that he is disabled and entitled to lifetime benefits.
*390 For the following reasons, and after reviewing the evidence presented, we find that there remain genuine issues of material fact as to Dr. Berry’s ability to perform his occupation and whether or not he is totally disabled.
INTERPRETATION OF INSURANCE POLICIES
We start by recognizing that insurance policies are to be read broadly in favor of coverage and that ambiguities are construed against the insurer. Schmidt v. Blue Cross and Blue Shield of Louisiana, Inc., 33,179 (La.App. 2nd Cir.9/27/00), 769 So.2d 179, 181, writ denied, 00-3011 (La.12/15/00), 777 So.2d 1234. An insurance policy is construed as a whole, and each provision in the policy must be interpreted in light of other provisions. If an ambiguity remains after applying the general rules of contractual interpretation, the ambiguous |9insurance policy provision is construed against the insurer that furnished the policy’s text and in favor of the insured. Doe v. Breedlove, 04-0006 (La. App. 1st Cir.2/11/05), 906 So.2d 565, 570. Further, the issue of whether a contract is ambiguous or not is a question of law. Lafleur v. Dugas, 97-958, pp. 5-6 (LaApp. 3rd Cir.5/6/98), 714 So.2d 792, 794, unit denied, 98-1518 (La.9/18/98), 724 So.2d 767; Borden, Inc. v. Gulf States Utilities Co., 543 So.2d 924, 928 (La.App. 1st Cir. 1989), unit denied, 545 So.2d 1041 (La. 1989).
The record reveals no dispute over the fact that Dr. Berry’s “occupation” as defined by section 1.9 of the policy is that of an “anesthesiologist.” This does not encompass the broader occupation of physician.
As previously noted, “sickness” is defined by section 1.6 of the policy and means “sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force.” All parties agree that addiction is a sickness or disease and, in this case, Dr. Berry’s sickness falls within the definition of section 1.6 of the policy.
The policy does not define disability in terms of legal or factual disability, but sets forth at section 1.10 “Total Disability” means that “because of Injury or Sickness: (a.) You are unable to perform the important duties of Your Occupation; and (b.) You are receiving Physician’s Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician’s Care would be of no benefit to You.”
Even though the policy does not define disability in terms of legal or factual disability, the State of Louisiana, like all states, requires a medical license to be issued to a doctor before he can practice his profession. The ability to obtain a license may have a bearing on the issue of disability and the doctor’s ability to perform his occupation.
| inINQUIRY INTO LEGAL “DISABILITY”
Dr. Berry first counters Paul Revere’s claim that he is not disabled under the policy by asserting that the revocation of his medical licenses in the states of Washington, Arizona, and Louisiana render him legally totally disabled, because they prohibit him from practicing his occupation of anesthesiology. He focuses in particular on the Louisiana Consent Order, which provides that he may never return to the occupation of anesthesiology or pain management.
There is no rule that legal impediments per se can never be a basis for disability. This issue should ultimately turn on the facts and the language of the insurance contract. If the suspension of the license *391 arises out of the covered sickness, then it may be a basis for determining disability. Indeed, many jurisdictions are in accord that where a health-related disability, on its own, would make a return to work impossible, the existence of a legal disability, even one caused by the health-related disability, does not justify the denial of benefits. See Colby v. Assurant Employee Benefits, 603 F.Supp.2d 223, 245 (D.Mass., 2009); Paul Revere Life Ins. Co. v. Bava-ro, 957 F.Supp. 444, 449 (S.D.N.Y. 1997). Bavaro lays out the operative standard applied by those courts:
If [the claimant] demonstrates to the trier of fact that he is unable to work because of his mental and emotional problems then he is entitled to disability payments, despite the existence of his subsequent legal disability. If, however, the trier of fact believes that but for his legal disability he would be able to perform his occupation, then he is not entitled to disability payments.
Paul Revere Life Ins. Co. v. Bavaro, 957 F.Supp. at 449.
We recognize that some jurisdictions take the view that disability insurance policies provide coverage for factual disabilities and not legal disabilities, such as suspensions or revocations of occupational licenses. Goomar v. Centennial Life Insurance Company, 855 F.Supp. 319, 325 (S.D.Cal. 3/8/94), citing 15 G. Cough, Cyclopedia of Insurance Law § 53.41 (2d ed. 1983); see also Brumer v. National \^Life of Vermont, 874 F.Supp. 60 (E.D.N.Y. 1/24/95). In Goomar, a physician’s license was revoked after he was investigated and found to have sexually molested four female patients. Later, the physician claimed to have a certain mental illness that caused him to engage in the molestations. The Goomar court rejected the physician’s assertion that his disability led to the conduct that caused the loss of his medical license, which prevented him from engaging in his occupation, stating:
It is a general rule that disability insurance policies, such as those at issue in the instant case, provide coverage for factual disabilities (i.e., disabilities due to a sickness or injury) and not for legal disabilities.
Goomar, 855 F.Supp. at 325. The court denied the plaintiff disability benefits on that basis, concluding that his inability to practice his regular occupation was due to his license revocation rather than a sickness or injury as required by the policy language. Id. at 326.
Similarly, in Brumer, a practicing podiatrist’s license to practice was suspended for a period of eleven months as a result of his being charged with a number of offenses, including the performance of needless surgery and tests, insurance fraud, and misleading advertising. During the time his license was suspended, the podiatrist developed a medical condition that permanently affected his eyesight and rendered him physically unable to perform podiatric surgery. The court affirmed the insurance company’s denial of disability benefits, citing the general rule distinguishing legal disability from factual disability, and finding that the podiatrist’s factual disability, for which the policy would provide coverage, arose during his suspension or legal disability, when he was not engaged in the occupation of podiatry. 874 F.Supp. at 64-65. See also Allmerica Financial Life Insurance and Annuity Company v. Llewellyn, 139 F.3d 664 (9th Cir. 1997) (A chiropractor, claiming disability based on depression, was denied disability benefits because his chiropractic license was revoked as a result of an investigation revealing work-related fraudulent activities. The court concluded that the | ^chiropractor was not disabled because it was his legal disability — revocation of li *392 cense — that prevented him from continuing to practice, rather than his factual disability, the claimed mental illness of depression).
Dr. Berry contends that Goomar, Brumer, and Lleivellyn are distinguishable from the issue before this court, as the parties recognize that addiction is a “sickness or disease” within the meaning of the policy. This “sickness” manifested itself while the policy was in force and as a result of this “sickness,” he cannot obtain a license to practice his “occupation” as an anesthesiologist.[6] Dr. Berry contends that it is the “sickness” that prevents him from obtaining his license, not any criminal act allegedly resulting from the sickness.
We find this factual inquiry as to Dr. Berry’s licensing status remains a genuine issue of material fact. Our review of the record reveals that the license revocations imposed on Dr. Berry could have been based upon and in response to his addiction (sickness or disease under the policies); the negligence in the performance of his duties; his wrongful acts of diverting his patient’s medications for his own personal use; or a combination of all three. Thus, we believe there remains a genuine issue of material fact concerning whether Dr. Berry’s claim for benefits arises from factual disability and not solely on his inability to practice medicine based on the revocation of his medical licenses.
INQUIRY INTO PHYSICAL/MENTAL DISABILITY
Paul Revere argues that the facts alone establish that Dr. Berry is not disabled as defined by the policy language. The record reveals that Dr. Berry has remained drug free, sober, and under the continuous care of his treatment team | ,ssince November 2002. At the time of the hearing on the motion, Dr. Berry had been drug free and sober for almost five years. Moreover, Dr. Berry still possesses the requisite knowledge, skill, and experience required of an anesthesiologist.
Dr. Berry claims that because there is an ever-present risk of relapse, he is totally disabled from ever returning to his former occupation. He relies on the language of the insurance policy and the opinions of his treating physicians to establish that he is disabled. Those physicians contend that under the prevailing medical standard, Dr. Berry should not return to his former occupation, given that he will have direct access to narcotics to which he is addicted, thus raising the risk of his having a relapse. Paul Revere’s position is that the specific issue — whether the risk of a future relapse into addiction renders an anesthesiologist unable to perform the duties of his occupation, and therefore, disabled — is res nova in Louisiana. Defendant cites numerous cases throughout the country in which courts have addressed very similar issues and concluded that such a risk does not render a claimant presently totally disabled under the language of the policies at issue. Paul Revere asserts that the analysis employed by these other courts is sound and applicable to the facts and circumstances presented herein.
*393 As noted earlier, the issue before us is res nova in Louisiana. Paul Revere suggests that this court follow the holding in Stanford v. Continental Casualty Company, 455 F.Supp.2d 438 (E.D.N.C.2006), affd, 514 F.3d 354 (4th Cir.2008). That court was faced with issues similar to those presented herein, with the noted distinction that the plaintiff in that case was a certified registered nurse anesthetist (CRNA) who became addicted to anesthetic drugs.
The district court in Stanford held that the risk that the plaintiff would relapse did not render him continually unable to perform the material and substantial duties of a CRNA; therefore, he was not disabled under the terms of the insurance plan. In affirming the holding that the potential risk of relapse did not | ^entitle the CRNA to disability benefits because the plan does not cover this type of potential risk, the U.S. Fourth Circuit explained the differences contemplated by the policy language:
[T]he risk of a heart attack is different from the risk of relapse into drug use. A doctor with a heart condition who enters a high-stress environment like an operating room “risks relapse” in the sense that the performance of his job duties may cause a heart attack. But an anesthetist with a drug addiction who enters an environment where drugs are readily available “risks relapse” only in the sense that the ready availability of drugs increases his temptation to resume his drug use. Whether he succumbs to that temptation remains his choice; the heart-attack prone doctor has no such choice.
Stanford, 514 F.3d at 358. The court was sympathetic to the difficulty in overcoming an addict’s temptation, but maintained that the availability of that choice distinguishes an addiction risk of relapse from those other relapse risks that would be deemed a disability under similar policy language.
Defendant also relies upon Allen v. Minnesota Life Insurance, 216 F.Supp.2d 1377 (N.D.Ga.2001) where another court addressed the same issue under similar facts and disability policies. The court in Allen held that an anesthesiologist who developed an addictive disorder involving Fentanyl, attended rehabilitation treatment, and successfully achieved sobriety was not “disabled” within the scope of the policy, because his opiate addiction, in his rehabilitated state, did not render him unable to perform the duties of his occupation. The Allen court seemingly did not accord significant weight to plaintiffs treating physician’s testimony that plaintiff should not return to the practice of anesthesiology based on plaintiffs own fear of relapse, his previous history of “relapse behavior,” and his “demonstrated inability to follow directions.” Allen v. Minnesota Life Insurance, 216 F.Supp.2d at 1383-1384. The court rejected the physician’s opinions concluding they were “based on future potentialities rather than any present impediment.”
However, we note that there is no uniformity of opinion amongst the courts concerning the role “choice” or “free will” plays in an addict’s risk of relapse. | ^Nevertheless, we conclude that the moral implications of “choice” are not for us to decide. We additionally note that the terms “free will” or “choice” are not used in the Paul Revere policy issued to Dr. Berry.
Our sole task is to determine whether, within the confines of this policy, the risk of relapse for drug addiction is excluded as a disability. The policy at issue does not distinguish between mental and physical disabilities. In other words, the policy itself does not treat the risk of relapse for physical and mental disabilities differently. *394 As such, we do not find that the policy at issue categorically excludes the risk of relapse for drug addiction as a basis for disability.
We find persuasive the recent opinion of the United States District Court for the District of Massachusetts in Colby v. Assu-rant Employee Benefits, and agree with that court’s position that cases such as Stanford, supra, commit a moralistic error in arbitrarily separating risk of relapse into physical sickness from risk of relapse into mental illness. Colby, 603 F.Supp.2d at 242-243. The Stanford court, and others, unilaterally rejected the risk of relapse into a mental illness without any support from the policy language. Those insurers, as Paul Revere here, could have inserted limiting language into the policies regarding risk of relapse, but did not do so. As such, we also agree with the Colby court that the focus instead should be on whether the evidence of the probability of a relapse is sufficiently high to justify a finding of disability. Id. at 243. See also Kufner v. Jefferson Pilot Financial Insurance Co., 595 F.Supp.2d 785, 797 (W.D.Mich.2009) (a district court judge found that an insurance company’s denial of disability benefits was arbitrary and capricious because it failed to account for the “extensive medical evidence” of the opioid-addicted doctor’s risk of relapsing into substance abuse) and Holzer v. MBL Life Assurance Corp., No. 97 Civ. 5834(TPG), 1999 WL 649004, at 4-6 (S.D.N.Y. Aug. 25, 1999) (A district court held in a non-ERISA case under the normal summary judgment standard, a triable issue of fact existed as to whether an | ^anesthesiologist, with a stipulated diagnosis of opioid dependence, continues to suffer from a chemical dependency that qualifies as a “sickness” within the terms of the policy after treatment and an asserted four-year abstinence. Specifically, the court opined that a triable issue of fact remained concerning whether Holzer has reached a point where he could perform the duties of an anesthesiologist without resuming his drug abuse.)
This record contains the affidavits of both of Dr. Berry’s treating physicians, Drs. Hickman and Correa. Both Paul Revere and Dr. Berry rely on the opinions contained in the affidavits to support their arguments regarding whether Dr. Berry is “disabled” pursuant to the terms of the policies.
Dr. Dean A. Hickman, a board-certified clinical psychiatrist, specializing in addiction psychiatry, is also the medical director of the Addictive Behavior Unit at Ochsner Foundation. He attested that Dr. Berry had been under his continuous care for treatment of his addictive disease since June 2004, and that Dr. Berry had been compliant with all medical requests and demands made of him, including attending several 12-step AA meetings per week and giving random urine samples. Given that the addiction for which he was treating Dr. Berry in 2004 was a relapse of a prior addiction which began in 2001, Dr. Hickman considered Dr. Berry to be unsuited to the practice of anesthesiology, since any return to the practice would expose him to the availability and administration of controlled substances and, therefore, posed a significant risk of relapse. For these reasons, Dr. Hickman attested that it was his firm opinion that Dr. Berry “should never return to the practice of anesthesiology for the remainder of his life.”
Dr. Eileen Correa, a clinical psychologist and head of the Section of Psychology and program director for the Addictive Behavior Unit at Ochsner Clinic Foundation, attested that Dr. Berry had been continuously under her care for treatment of addictive disease since February 2003, including weekly individual 117and group *395 therapy sessions. Dr. Correa attested that Dr. Berry had been compliant with all of his medical treatment and had continuously maintained sobriety. She further attested that Dr. Berry’s recovery had been intact throughout his treatment. However, Dr. Correa also testified that Dr. Berry had been in denial as to the depth and extent of his addiction to Demerol, which resulted in his relapse and hospitalization in June 2004. Given this history, Dr. Correa also stated that due to the risk of relapse, it was her opinion that Dr. Berry should never return to the practice of anesthesiology for the remainder of his life.
Dr. Berry relies on the sworn statements and opinions of his physicians, recommending that he not return to work, as proof that his addiction renders him permanently disabled. Paul Revere also relies on these affidavits, noting that while both physicians recommend that Dr. Berry should not return to practice, neither physician opined that he could not or was physically or mentally incapable of performing the important duties of an anesthesiologist in his current state of sobriety and rehabilitation.
Yet, we find the reports of Paul Revere’s own independent medical examiners are ambivalent on the issue, as follows:
John W. Thompson, Jr., M.D., Forensic Neuropsychologist
It is my opinion that Dr. Berry was not attempting to malinger during the evaluation.
It is my opinion that Dr. Berry has a guarded prognosis.
It is my opinion that if Dr. Berry were to return to the active practice of anesthesiology he would likely relapse in a short period of time unless there was intensive supervision.
F. William Black, Ph.D.
From a neuropsychological and emotional perspective, effective treatment should result in Dr. Berry returning to his pre-substance abuse level of functioning. However, this matter is obviously markedly complicated by a history of relapsing significant substance abuse. I am very concerned that there is a strong potential that the patient would relapse if he were to return to the practice of 118anesthesiology or any other aspect of medicine where he had access to IV narcotic medications.
I do not have the sense that Dr. Berry is continuing to claim disability on the basis of choice, career dissatisfaction, and adoption of the sick role or secondary claim.
The policy at issue also requires Br. Berry to be under a “Physician’s Care.” The policy does not afford the insurer the right to select the physician or direct the manner and form of treatment. Yet, the reports of Paul Revere’s retained experts and own in-house psychiatric director, Dr. John J. Szlyk, M.D., appear to question the comprehensibility of the treatment afforded Dr. Berry. Dr. Thompson remarked that it was his opinion that Dr. Hickman and Dr. Correa are “extremely competent to provide chemical dependency treatment to Dr. Berry” yet he proposed the adoption of a more active treatment approach given Dr. Berry’s level of chemical dependency. As such, we find the medical evidence demonstrates that genuine issues of material fact remain.
We find that triable issues of material fact remain based on the affidavits submitted by Dr. Berry and Paul Revere, as to whether Dr. Berry is able to return to the important duties of his occupation without seriously risking his health and the health and well-being of the public he may serve. On the record before us, we *396 are unable to quantify Dr. Berry’s probability of a relapse, which we find crucial to a determination of “disability”.
CONCLUSION
For all of the foregoing reasons, we find that there are genuine issues of material fact, and that neither Paul Revere nor Dr. Berry have made the requisite showing that they are entitled to judgment as a matter of law. Accordingly, the judgment of the trial court dismissing plaintiffs claims with prejudice is reversed. We affirm the trial court judgment denying Dr. Berry’s motion for summary | Hjudgment. All costs in this matter are to be equally borne by Paul Revere and Dr. Berry.
REVERSED IN PART, AFFIRMED IN PART AND REMANDED.
GUIDRY, J. dissents and assigns reasons.
McCLENDON, J. dissents for the reasons assigned by judge GUIDRY.
KUHN, J., concurs and assigns reasons.

. In his brief, the plaintiff also assigns error to the trial court's denial of his previously filed motion for summary judgment by judgment signed on August 21, 2007. The denial of a motion for summary judgment is an interlocutory judgment, which the trial court may change at any time up to final judgment. Although the motion and order for devolutive appeal seeks review of only the October 24, 2007 judgment granting defendant’s motion for summary judgment, we may examine and review the interlocutory ruling on an appeal from a final judgment. Young v. City of Plaquemine, 04-2305 (La.App. 1st Cir. 11/4/05), 927 So.2d 408. Therefore, we consider the correctness of the prior interlocutory ruling, denying plaintiff's motion for summary judgment.

. The record indicates that Dr. Berry practiced out of the Lakeview Hospital in Coving-ton, Louisiana, for Lakeview Anesthesia Associates from January 1997 through March 2001. In May 2001, he began working through Staff Care, a company that places physicians in temporary positions throughout the country. Staff Care placed Dr. Berry as an anesthesiologist at Kadlec Medical Center in Richland, Washington, where he practiced until November 2002.

. Plaintiff asserted the amount of past benefits due was $121,485.00 as of June 13, 2007.

. Plaintiff asserted the present value of future benefits was $1,538,947.00 as of June 13, 2007.

. Likewise, Dr. Berry, also as mover for summary judgment, bore the burden of establishing the absence of genuine issues of material fact and entitlement to judgment as a matter of law.

. We note that Goomar, Brumer and Llewellyn are distinguishable because in each of those cases the legal disability occurred prior to the requests for benefits based on a physical disability. Although the insureds in Goomar and Llewellyn may have suffered from an illness prior to the onset of the legal disability, the illness did not become disabling until after that time. By contrast, Dr. Berry had a documented substance abuse problem dating back at least to 2002, began receiving disability benefits in March 2003, and did not sustain the revocation of his medical licenses until 2004 in the state of Washington and until 2005 in Louisiana and Arizona.