**Dr. Julie COLBY, Plaintiff**

v.

**ASSURANT EMPLOYEE BENEFITS, Fortis Benefits Insurance Company, Management Company for Merrimack Anesthesia Associates Long Term Disability Plan, and Union Security Insurance Company and Management Company for Merrimack Anesthesia Associates Long Term Disability Plan, Defendants.**

Civil Action No. 07–11488–RCL.

United States District Court, D. Massachusetts.

Feb. 23, 2009.

---

Joshua Bachrach, Wilson Elser Moskowitz Edelman & Dicker, LLP, Philadelphia, PA, Edward S. Rooney, Jr., Eckert Seamans Cherin & Mellott, LLC, Boston, MA, Gary N. Stewart, Rawle & Henderson LLP, Harrisburg, PA, for Defendants.

Mala M. Rafik, Alyssa A. Yenikomshian, Rosenfeld & Rafik, PC, Boston, MA, for Plaintiff.

**MEMORANDUM OF DECISION**

YOUNG, District Judge.

## I. INTRODUCTION

This is an action under the Employment Retirement Security Act of 1974, codified as amended at 29 U.S.C. §§ 1001–1461 (ERISA). The plaintiff, Dr. Julie Colby, M.D. ("Dr. Colby"), filed suit against the defendants, Assurant Employee Benefits, Fortis Benefits Insurance Company, Management Company for Merrimack Anesthesia Associates Long Term Disability Plan, and Union Security Insurance Company and Management Company for Merrimack Anesthesia Associates Long Term Disability Plan (collectively "USIC"), to recover long-term disability ("LTD") benefits she claims that USIC denied her in violation of 29 U.S.C. § 1132(a)(1)(B), as well as attorneys' fees and costs. In 2004, Dr. Colby, then an anesthesiologist, became addicted to Fentanyl, a powerful opioid that she administered to patients, as a means of coping with severe back pain. After the discovery of her addiction by coworkers, Dr. Colby stopped working, had her medical license revoked, and enrolled into an in-patient substance abuse recovery program. At that time, Dr. Colby also applied for LTD benefits under her LTD policy ("the Plan" or "the LTD Plan") with USIC, which USIC granted for the duration of Dr. Colby's stay at the rehabilitation center. Upon her discharge, however, USIC terminated her benefits. Claiming that Dr. Colby no longer had symptoms of active substance abuse, USIC's primary justification for the termination was that "the risk of relapse [into substance abuse] is not the same as a current disability." In other words, USIC categorically excluded risk of relapse into drug abuse as an impairment that could ever render an individual disabled such that he or she would be eligible for benefits under the Plan. After twice unsuccess-

fully appealing USIC's determination and challenging its interpretation of the Plan, Dr. Colby instituted these federal proceedings in 2007, claiming that USIC's termination of her benefits was arbitrary and capricious.

The parties filed cross motions for summary judgment, and then agreed to resolve their dispute as a case stated. "When deciding a case stated, a court draws such inferences as are reasonable to resolve the case, rather than drawing all inferences against each moving party as it would when evaluating cross-motions for summary judgment." *Dickerson v. Prudential Life Ins. Co. of Am.*, 574 F.Supp.2d 239, 241 (D.Mass.2008) (quotation marks and citation omitted); *See Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 3 n. 4 (1st. Cir.2009).

## II. FINDINGS OF FACT

### A. Dr. Colby's History of Back Issues and the Onset of Her Substance Abuse

In 1988, Dr. Colby, a native of Canada, moved to the United States and became a partner at the Merrimack Valley Anesthesia Associates. US[1] 524. Through her practice, Dr. Colby worked as a staff anesthesiologist at the Anna Jacques Hospital in Newburyport, Massachusetts. *Id.* Dr. Colby worked approximately 60 to 90 hours per week, and took overnight calls approximately 2–3 times per week. *Id.* Between 1988 and August 2004, Dr. Colby never missed a day of work. US 525.

Beginning in the summer of 2000, Dr. Colby began experiencing lower back pain and numbness in her left leg. *Id.* The problems with her leg initially caused her to trip clumsily, but by June 2000, her left calf muscle ceased functioning. US 525–

26. Doctors diagnosed Dr. Colby with a herniated disc at L5–S1, and she underwent a discectomy in September 2001. US 526. The surgery allowed Dr. Colby to regain use of her left calf muscle, but her back pain and some left leg numbness persisted. *Id.* According to Dr. Colby, because of her continuing symptoms, she began to self-medicate using Fentanyl, a powerful opioid, left over from surgeries in the operating room. US 444, 527. Within a short time period, Dr. Colby became addicted to and dependent on Fentanyl.

In April 2004, Dr. Colby sought the advice of Dr. Paul Glazer ("Dr. Glazer"), a spinal surgeon, who diagnosed Dr. Colby with degenerative disc disease at several places along her spine. US 526. Dr. Glazer recommended spinal fusion surgery, but Dr. Colby refused because she was concerned about losing her position in her medical practice. *Id.*

In July 2004, an employee of Dr. Colby's practice discovered her sleeping or unconscious on a nursing staff table in the hall of the hospital. US 444. The head of the anesthesia group requested a urine drug screen, which was positive for Fentanyl. *Id.* Dr. Colby voluntarily relinquished her license to practice medicine in August of 2004, and formally had her license revoked in July 2005.

### B. Dr. Colby's Substance Abuse Treatment

On August 16, 2004, upon recommendation of the Massachusetts Physician's Health Services, Dr. Colby enrolled herself in the Talbott Recovery Campus in Atlanta, Georgia, a facility that specializes in treating doctors with substance abuse problems. Dr. Colby remained at Talbott

---

1. Unless otherwise indicated, all citations are to the administrative record prepared by USIC. The pages in that record are identified by the prefix "US," and the Court has adopted the same convention.

until her discharge on November 20, 2004. US 935.

Her physical and psychological intake exams, supervised by Michael Wilkerson, M.D. ("Dr. Wilkerson"), revealed a number of health issues. First, and most obviously, Dr. Colby suffered from opioid dependence. US 935. Staff physicians also diagnosed Dr. Colby with dysthymic disorder, a history of major depression, and obsessive compulsive personality traits. US 936. Further, Dr. Colby reported that her back pain from her degenerative disc disease rated a 6 out of 10 on the Manoski's pain scale. US 940. During her time at Talbott, Dr. Colby began engaging in a rigorous, 2–3 hours per day exercise program, that by the time of her discharge had reduced her back pain to a 1 or 2 out of 10. US 937, 940. Her mental health improved markedly as well. Dr. Colby engaged in daily group meetings to discuss her addiction, and asked and received permission to cease taking the antidepressant drug Zoloft, which she had been taking since at least 2003. US 937. Her discharge summary stated that Dr. Colby "explored the idea of returning to school and finding an area of medicine where she would not be exposed to her drug of choice." US 940. Despite the encouraging signs of progress, Dr. Wilkerson recommended on discharge

> that she not return to the practice of medicine for six months to allow her to continue to work on her recovery and stabilize her home situation. The patient will be reevaluated at Talbott Recovery Campus in approximately six months to determine if, at that time, she

is ready to return to the practice of medicine.

*Id.*

## C. Dr. Colby's Application for Long–Term Disability Benefits

On September 24, 2004, while Dr. Colby was still at Talbott, she applied for long-term disability benefits under the plan she purchased from USIC. U.S. 1188–89. In general terms [2], the Plan provided that if a sicknesses rendered Dr. Colby disabled—defined as being unable to perform a material duty of her profession, including the ability to work full time—she would receive 60% of her monthly pay until the age of 65, subject to a maximum monthly benefit of $4,000.

During late 2004, USIC began collecting treatment records in order to determine whether Dr. Colby was entitled to LTD benefits. Relying on an Attending Physician Statement and a Supplementary Attending Physician Report, both filed by Dr. Wilkerson, USIC granted disability benefits to Dr. Colby for the period between November 8, 2004 [3] and November 20, 2004, the date that Dr. Colby was discharged from Talbott. US 1464.

Dr. Wilkerson's short Attending Physician Statement explained that Dr. Colby suffered from opioid dependence, was "in intensive residential tx [treatment] at Talbott Recovery Campus," was "able to function in most stress situations and engage in only limited interpersonal relations," and finally that she could not "work while in treatment." US 1116–17. Dr. Wilkerson's even shorter Supplemental Report stated rather cryptically that Dr. Colby

---

**2.** The specific terms of the Plan are discussed in greater detail in the Rulings of Law section, *infra.*

**3.** The operative date for the commencement of benefits was November 8, 2004, rather than August 10, 2004 (the day she stopped working) because LTD benefits under the Plan did not begin until 90 days after that date when the individual becomes disabled.

could do "no work until approved by monitor." US 1162.

## D. The Termination of Benefits

After this initial granting of benefits for a 12–day period, USIC engaged in a more thorough analysis to determine whether Dr. Colby would qualify for benefits after November 20, 2004. USIC requested, with Dr. Colby's permission, records from Dr. Wilkerson, Dr. Glazer, CVS Pharmacy, and a number of other doctors who had treated Dr. Colby, although prior to making a determination on benefits USIC did not receive pharmacy records. USIC then provided those records to the following independent and USIC staff consultants who provided USIC with their opinions regarding whether Dr. Colby qualified for LTD benefits.

### 1. Dr. Allen J. Parmet's Review for "Physical Limitations" for USIC

Allen J. Parmet, M.D., MPH ("Dr. Parmet")[4] conducted an independent review on behalf of USIC to determine whether Dr. Colby suffered from any "physical limitations." US 920. In conducting his review, Dr. Parmet relied primarily on Dr. Colby's treatment records from Talbott, specifically reports filed by Dr. Wilkerson. Although recognizing that Dr. Colby suffered from a combination of opioid dependence, which he classified as "currently in remission," and degenerative disc disease, Dr. Parmet focused primarily on two issues. US 922. First, he commented that the revocation of Dr. Colby's license to practice medicine posed a legal barrier to her return to work. *Id.* Then, addressing the primary purpose of his review, Dr. Parmet noted that for Dr. Colby "[p]hysical limitations may be present in the form of degenerative disc disease of the lumbar spine, but these pre-existed the current events and did not impose any limitations." *Id.* Dr. Parmet stated that none of Dr. Colby's treating physicians identified any explicit "physical limitations." *Id.* Dr. Parmet concluded that "[n]o physical limitations have been documented to exist in this claimant. Licensure limitations may exist." *Id.*

### 2. Karen Sherwood's Occupational Assessment for USIC

On June 16, 2005, Karen Sherwood, M.D., CRC ("Sherwood"), employed as a Vocational Consultant for USIC, reviewed information submitted by Dr. Colby. Without providing any detailed discussion, she concluded that Dr. Colby's "jobs[sic] falls within the occupation of Physician," as opposed to the more specific occupation of anesthesiologist. US 1393.

### 3. Dr. Mike Jones' Psychological Assessment for USIC

In order to determine whether Dr. Colby suffered from any psychological limitations that would qualify her for benefits, on July 6, 2005, Mike Jones, Ph.D. ("Dr. Jones"), a staff psychologist at USIC, conducted a Behavioral Health Services Assessment of Dr. Colby's claim. Dr. Jones did not meet with or personally examine Dr. Colby, but rather relied exclusively on the records documenting Dr. Colby's treatment at Talbott. US 1386. From these records, Dr. Jones recognized that Dr. Colby suffered from myriad psychological problems, including her well documented opioid dependence, major depressive disorder, dysthymia, and pain disorder of mixed etiology. Dr. Jones stated, however, that

4. In her brief, Dr. Colby emphasizes that Dr. Parmet, who specialized, *inter alia,* in Space Medicine, was not qualified to conduct a review of Dr. Colby's records to determine if a disability existed. Dr. Colby's Mot. for Sum. J. at 22. The Court finds, however, that Dr. Parmet's impressive medical background made him more than qualified to provide an opinion regarding Dr. Colby's physical health.

the Discharge Summary from Talbott indicated that none of these diagnosed mental illnesses presented any limitations preventing Dr. Colby from returning to work. Dr. Jones ultimately concluded that

> while it has been recommended that she not return to work for six months post discharge, the exact rationale for this is unclear.... Michael Wilkerson, M.D. wrote on a Supplementary Report dated 12/23/04 that Dr. Colby was not to work "until approved by the monitor." Again, the record has no clear indication of what her exact limitations are from returning to work. The mental status and behavioral observations in the discharge summary and treatment notes certainly do not suggest that Dr. Colby now presents with serious mental health symptoms that are preventing her from returning to work.

US 1391. Given the shortcomings in the records before him, specifically the lack of any information concerning treatment subsequent to Dr. Colby's discharge from Talbott, Dr. Jones recommended that additional records be obtained in order to render a more reasoned determination. *Id.*

#### 4. The Termination Letter

On July 26, 2005, Dr. Colby received notice, via letter, that USIC was denying her claim for disability benefits after November 20, 2004. US 1447–51. The letter classified Dr. Colby's occupation as a physician. US 1448. USIC listed the medical records it reviewed, and, proceeding disorder by disorder, concluded that none of Dr. Colby's physical or psychological issues presented any limitations to her return to work. USIC placed particular emphasis on the fact that Dr. Wilkerson, upon discharging Dr. Colby from Talbott, placed no medical limitations on her return to work. The letter further noted that "while her license and hospital privileges are apparently in suspension, this is not related to her ability to perform as a physician." USIC explained that "[b]ased on [the information we reviewed], Dr. Colby does not ... meet the definition of disability [beyond 11/20/04]. Consequently, we are unable to pay further benefits on Dr. Colby's claim." US 1450.

#### E. Dr. Colby's First Appeal

On January 19, 2006, Dr. Colby appealed USIC's termination of LTD benefits. Along with her appeal, Dr. Colby submitted a significant quantity of additional medical documentation of her alleged disability, including medical records and a treatment summary from her therapist, Patricia Dell–Ross; an independent medical examination report by Dr. Alan Wartenberg, a doctor specializing in addiction treatment; and an independent vocational evaluation by James T. Parker, a vocational rehabilitation expert.

#### 1. Patricia Dell–Ross' Therapy Records and Summary of Her Treatment of Dr. Colby

Patricia Dell–Ross ("Dell–Ross"), a licensed social worker, served as Dr. Colby's therapist from October 2003 until the present. She submitted to USIC records of her meetings with Dr. Colby from October 2003 until August 31, 2005. US 785–93. During that time, Dell–Ross met with Dr. Colby at least monthly with the exception of the period in which Dr. Colby sought inpatient treatment at Talbott. Dell–Ross's records contained entries documenting the topics she and Dr. Colby addressed at each meeting, including details about her abusive relationship with her husband (which resulted in Dell–Ross diagnosing Dr. Colby with "minor PTSD"), her traumatic divorce, the death of her mother, her substance abuse, her self-esteem and confidence issues, and her work-life balance problems.

Dell–Ross' notes from sessions after Dr. Colby was discharged from Talbott contained a number of observations central to whether Dr. Colby could in fact return to work, a topic discussed by the two at almost every meeting. Dr. Colby repeatedly expressed a desire to return to her practice but was concerned about how the "stressful, long houred sched[ule]" would make her "vulnerable" to "potential relapse." US 791. Dr. Colby stated that she was "too compromised to return in her chosen field and questions how she can at pres[ent] in [a] hosp[ital] setting. [Dr. Colby] sees vulnerability to relapse but [is] resolute." US 792. At another session the two

> looked at how she could return to work at some point and work a more realistic schedule. Yet, having thoughts re: relapse prevention and feels if she didn't exercise daily she would reexperience severe back pain associated w/work and be vulnerable to sub[stance] abuse. Difficult to determine how to work full time, be on call as expected in her profession and get in enough time for exercise so that back pain abated. Doesn't see p[ar]t time work as an option in her field and specialty.

*Id.*

In her sessions with Dell–Ross, Dr. Colby also mentioned at least two skiing trips that she took with her children. US 790.

For the purposes of Dr. Colby's first appeal, Dell–Ross also submitted a letter summarizing her treatment with Dr. Colby. US 795–96. Dell–Ross acknowledged Dr. Colby's licensure issues, but stressed the danger of relapse that Dr. Colby would face, magnified by the interrelation of her dysthymia (potentially exacerbated by the death of her supportive mother), back pain, and opioid addiction, if she returned to any position in which she had access to opiates. Dell–Ross concluded that "Dr. Colby is in a period of early recovery from opiate dependence and is vulnerable to relapse. She cannot have access to substances during this period." US 796.

### 2. Dr. Alan Wartenberg's Independent Medical Examination

On October 25, 2005, Alan Wartenberg, M.D., FACP, FASAM ("Dr. Wartenberg"), an addiction specialist, conducted an independent, in-person examination of Dr. Colby. US 813–817. Dr. Wartenberg based his conclusions on his examination of Dr. Colby and his review of Dr. Parmet's and Dr. Jones' analyses, the records from Talbott, and Dell–Ross' session notes. He found that Dr. Colby suffered from back pain ("which she states is still at the level where she started to use fentanyl," U.S. 815) and untreated depression/dysthymia, and evinced limited appreciation for "the significance of her fentanyl use and the danger in which it placed her." *Id.* He stated that

> Dr. Colby has clearly demonstrated opioid dependency and continues, in my opinion, to a reasonable degree of medical probability, to be at risk for relapse.... It is my belief to a reasonable degree of medical certainty that Dr. Colby is at high risk of relapse should she return to the practice of anesthesia, or to any situation where she could access anesthetic opioids. Dr. Colby's continued minimalization and denial put her, in my opinion, to a reasonable degree of medical certainty, at an even greater risk of relapse if she returns to the practice of anesthesia.

US 816. Dr. Wartenberg also noted Dr. Colby's licensure limitations. *Id.*

### 3. James T. Parker's Independent Vocational Assessment

On November 25, 2005, James T. Parker, CRC, CCM ("Parker"), a licensed rehabilitation counselor and certified vocational expert, conducted an independent

vocational evaluation of Dr. Colby's claim for LTD benefits. US 823–28. Parker based his conclusions on review of relevant records and a telephonic interview with Dr. Colby. First, Parker classified Colby's occupation as an anesthesiologist, not as a physician as USIC had done. Parker took issue with the Occupational Assessment Report submitted by Sherwood initially used to deny Dr. Colby's claim, noting that because USIC does not publish its occupational definition methodology, that it is of "unknown validity and reliability." According to Parker, other occupational classification systems "define anesthesiologist with a dedicated code that defines this occupation as a specific entity." US 827. As such, Parker stated that he "is of the opinion that the term 'physician' is overly broad and inappropriately groups distinct occupations into a single occupation." *Id.*

With respect to Dr. Colby's specific ability to complete the material tasks of her occupation, Parker asserted that impairments in major life activities resulting from Dr. Colby's "PTSD, Depression, Substance Dependence, and Dysthymic Disorder … prevent Dr. Colby from performing the executive level requirements … of the occupation of anesthesiologist. . . . It is this consultant's vocational opinion that she is currently disabled from the occupation of anesthesiologist." US 827–28.

### 4. Dr. Patricia Neubauer's Behavioral Health Services Assessment for USIC

On March 16, 2006, Patricia Neubauer, Ph.D. ("Dr. Neubauer"), a staff psychologist at USIC, conducted a Behavioral Health Services Assessment to determine whether Dr. Colby's "mental/nervous limitations past 11/20/04" qualified her for the receipt of LTD benefits. US 1379. Dr. Neubauer reviewed "the complete file," which included Dr. Colby's records of surgery and treatment for her back, her time at Talbott, her sessions with Dell–Ross,

the independent assessments by Dr. Wartenberg and Parker, and the assessments previously conducted by Dr. Parmet and Dr. Jones in conjunction with the initial termination of benefits. *Id.* Dr. Neubauer's report touched on each of those sources, and addresses each of Dr. Colby's diagnosed psychological issues. With respect to Dr. Colby's PTSD, dysthymia, major depressive disorder, and pain disorder (excluding opioid dependence), Dr. Neubauer concluded that as of November 20, 2004, none of those problems posed a limitation to Dr. Colby's return to the occupation of anesthesiologist or physician. US 1380–82.

With regard to Dr. Colby's opioid dependence, Dr. Neubauer diagnosed Dr. Colby with "opioid related addictive disorder." Dr. Neubauer asserted that "[a] diagnosis of drug addiction does not indicate impairment. Generally, claimants who are recovering and able to maintain sobriety with community support … should be able to resume activities of daily living including work." US 1382. Along these lines, Dr. Neubauer stated that

> [t]he recommendations that Dr. Colby not return to work as an anesthesiologist appears to be preventative rather than proscriptive. In other words, the available documentation provides no indication of current psychiatric symptoms such as emotional lability or psychomotor or cognitive deficits that would impact Dr. Colby's ability to perform the duties of her occupation. Rather, the goal of the recommendations is to reduce Dr. Colby's exposure to controlled substances for the purpose of relapse prevention. Needless to say, removing Dr. Colby from her work environment does not address the multitude of other potential sources of temptation or relapse with which opiate-addicted individuals contend.

*Id.* (emphasis added). Dr. Neubauer continued, explaining that Dr. Colby's

> claim is based primarily on her and her provider's plan for her to avoid her specialty as an anesthesiologist due to risk of relapse rather than the current presence of drug use and symptoms and conditions that would preclude working in her occupation. Dr. Wartenberg and her attorney have presented information that would suggest the inadvisability of her returning to her speciality as an anesthesiologist with access to narcotics and her drug of choice, Fentanyl. While she may choose to avoid that specialty, *the potential for relapse is not the same as current disability.* Her cognitive function is intact and there is no difficulty with her ability to analyze and provide opinions based on her analysis. Her ability to maintain her abstinence with community treatment has been sufficient for her to return to work in some setting.... While Dr. Colby cannot return to work without a license, the definition of disability does not include the legal aspects of the practice of her occupation, but instead whether medical factors, limitations, restrictions and impairments are consistent with performance of occupation duties. None of the Talbott documentation or the independent medical examination from Dr. Wartenberg show that she had active substance abuse or treatment intensity beyond 11/20/04 to prevent her from returning to active work.

US 1385 (emphasis added). Dr. Neubauer concluded that Dr. Colby suffered from no current psychological problems that would rise to the level of a disability under the LTD Plan.

### 5. Dr. Nina C. Smith's Clinical Services Review for USIC

On April 18, 2006, Nina C. Smith, M.D. ("Dr. Smith"), a consulting doctor for USIC, conducted a review of Dr. Colby's paper file to determine whether Dr. Colby's degenerative disc disease presented any ongoing limitations that would prevent her from returning to work. US 386–89. Dr. Smith examined all of the relevant files, including records from Dr. Colby's time at Talbott, MRIs of Dr. Colby's spine taken in the course of Dr. Colby's back treatments, and Dr. Wartenberg's independent report. Dr. Smith noted that with exercise and use of Feldene, a nonopioid, non-addictive pain reliever, Dr. Colby has "been successful keeping her pain intensity in the range of 0–2/10." US 387. Dr. Smith engaged in a long discussion of the prognosis for degenerative disc disease, explaining that

> what is left is the type of disease not unexpected for [Dr. Colby's age], and the kind of disease that responds to exercise and anti-inflammatory agents. Dr. Colby has reported success with this type of program with manageable pain and good response of her stiffness. Dr. Colby has not had any limitations and restrictions imposed on her by caregivers for her [degenerative disc disease]. Based on the clinical evidence and without any psychological issues, the remaining disease might support limitations from heavy work. She might need to be able to frequently change positions and stretch. The stretches can be done at the work site. Her usual occupation would allow this. She might need a special chair as opposed to a stool for long procedures. Dr. Colby reported her work schedule made her unable to maintain a schedule of exercise and adequate rest to control her back pain. Both adequate rest and exercise could be accomplished with a 60 hour work week.

*Id.* Given her findings, Dr. Smith concluded that "[t]he medical evidence does not support any physical limitations and restrictions from her own occupation, and no

physical limitations and restrictions have been claimed.... The medical evidence supports her ability to work a 60 hour workweek and maintain the rest and exercise she needs to help control her back symptoms." US 388–89. Dr. Smith recommended, however, that if Dr. Colby "should claim physical limitations and restrictions, a [Functional Capacity Evaluation (FCE)] might help determine her work ability." US 389.

### 6. USIC's Request for a Functional Capacity Evaluation

On May 15, 2006, Kimberly Myers, the claim administrator at USIC for Dr. Colby's appeal, requested that Dr. Colby undergo a Functional Capacity Evaluation at USIC's expense. On June 8, 2006, Mala Rafik, attorney for Dr. Colby, sent a letter to Myers, indicating that Dr. Colby's back pain was of the type that a "FCE is simply unable to capture.... Given her level of exercise, Dr. Colby is able to bend reach, sit and crawl for a brief period of time. What she is unable to do, however, is to return to her occupation as an anesthesiologist." US 277. Rafik assailed the subjectivity of FCEs, arguing that "there is no data which demonstrates the validity or reliability of the testing performed [USIC] required for Dr. Colby." US 278. In her letter, Rafik did not explicitly state that Dr. Colby would refuse to undergo a FCE, but neither did Rafik indicate Dr. Colby's amenability to the assessment. Dr. Colby never underwent a FCE.

### 7. Denial of Dr. Colby's First Appeal

On July 6, 2006, USIC denied Dr. Colby's first appeal via letter from Myers to Dr. Colby. The letter stated that USIC's determination was based on the review of records from Dr. Glazer, Dr. Berzansky, Talbott Recovery Campus, Dr. Wilkerson, Dr. Wartenberg, Dell–Ross, Dr. Lipman, and CVS Pharmacy, and also took into account the in-house analyses conducted by Dr. Jones, Dr. Parmet, Dr. Neubauer, and Dr. Smith. The denial classified Dr. Colby as a Physician, whose

> duties include, but are not limited to the following: (1) Ability to work on a full-time basis, as defined by the policy, if the worker was a full-time employee. (2) Review and evaluate medical records. (3) Diagnose medical condition of patient. (4) Express an opinion on or prescribe, diagnostic measures and treatment. (5) Record and/or report on facts and findings.

US 1413. The denial stated that

> [i]t is our understanding that Dr. Colby performs daily exercises for her back that helps with this condition. However, the pain from her back is not in and of itself a limiting condition. There is concern that should Dr. Colby return to work, she would be unable to continue on her regular exercise program that alleviates the pain in her back and may again start using pain medications.

*Id.* The remainder of the letter primarily repeated the information contained in Dr. Smith and Dr. Neubauer's reports. With respect to Dr. Colby's degenerative disc disease, the denial concluded that

> [t]here is no information that [Dr. Colby] has any limitations or restrictions related to her back condition given to her by any of her medical providers. Dr. Smith also noted that adequate rest and exercise could be accomplished despite Dr. Colby's work schedule and that some of the exercises could even be done at the work site, such as stretches. Dr. Smith concluded that there was no medical evidence to support any physical limitations or restrictions from her own occupation based on this condition.

*Id.*

With respect to Dr. Colby's mental illnesses, including her opioid addiction, the denial stated that

neither Talbott's records nor the independent medical examination by Dr. Wartenberg showed that Dr. Colby had active substance abuse or treatment intensity beyond November 20, 2004 to prevent her from performing active work. Dr. Neubauer indicated that it appears her claim is based primarily on her and her provider's plan for her to avoid her speciality as an anesthesiologist due to her risk of relapse rather than the current presence of drug use or symptoms and conditions that would preclude working in her occupation. While Dr. Colby may choose to avoid that speciality, *the potential for relapse is not the same as current disability.* ... While it is clear that Dr. Colby cannot return to her work without a license, the definition of disability does not include legal aspects of the practice of her occupation but instead whether medical factors, limitations, restrictions and impairments are consistent with the performance of occupational duties.

US 1414 (emphasis added). The report also explained that neither Dr. Colby's depression nor post traumatic stress disorder pose any limitations to her ability to return to her occupation.

Having found that "there is no evidence to suggest that Dr. Colby was unable to perform the material duties of her regular occupation as of November 20, 2004," USIC denied Dr. Colby's appeal. *Id.*

## F. Dr. Colby's Second Appeal

Upon receiving the denial of her first appeal, Dr. Colby notified USIC that she would exhaust her rights by bringing a second administrative appeal. In support of this second effort, Dr. Colby submitted a letter from her attorney critiquing Dr. Smith and Dr. Neubauer's assessments, as well as a supplemental letter from Dell–Ross also addressing USIC's assessment of Dr. Colby's claim.

### 1. Dell–Ross's Letter

Dell–Ross wrote, based on her work with Dr. Colby since the fall of 2003, that Dr. Smith's assessment was unrealistic. In Dell–Ross' opinion, Dr. Colby could not

sustain adequate rest and exercise within a 60 hour work week to prevent that level of chronic back pain from recurring. Her access to opiates, then, combined with the usual and unusual stressors of everyday life and work would make her relapse almost inevitable. She has discussed this probable outcome, stated clearly in Dr. Neubauer's report, with me, her colleagues in anesthesia, and staff and fellow patients at Talbot[sic] and in PHS group.

US 190. Dell–Ross also added that

Dr. Colby continues to be vulnerable to relapse due to the confluence of her conditions, i.e. recurrent depression, PTSD, chronic physical pain and opiate dependence. The sum of these conditions in combination with her character traits and lack of sufficient emotional supports is greater than the specific disability of each diagnosis considered separately, as occurred in these evaluations.

*Id.*

### 2. Denial of Dr. Colby's Second Appeal

On April 5, 2007, USIC upheld its previous denial of Dr. Colby's claim for benefits. Its letter indicated the medical records and recommendations upon which USIC relied. The letter again summarized Dr. Neubauer and Dr. Smith's conclusions that Dr. Colby did not suffer from a present illness that prevented her from working. The critical paragraph of the letter was as follows:

Both Dr. Wartenberg and Patricia Dell–Ross indicate that the primary reason they conclude that Dr. Colby is unable to work is due to a risk of relapse of her

addiction. The Committee noted *that while Dr. Colby may choose to avoid the specialty of anesthesiology, because of her exposure to opioids, the risk for relapse is not the same as a current disability.* The Committee also found that while it is clear that Dr. Colby cannot return to her work without a license, the definition of disability does not include the legal aspects of the practice of her occupation, but instead whether medical factors, limitations, restrictions and impairments are consistent with the performance of occupational duties.

US 1404 (emphasis added). The Appeal Committee ultimately concluded that Dr. Colby did not meet the Plan's definition of disability, and thus was not entitled to continued benefits. *Id.* Following receipt of the denial, Dr. Colby filed this suit in federal court. Doc. No. 1.

## III. RULINGS OF LAW

### A. Standard of Review

Dr. Colby and USIC submitted cross motions for judgment based on the administrative record in this case, and have agreed to permit the Court to resolve their dispute as a case stated. As such, rather than making all inferences against each moving party, the Court is empowered to resolve both issues of law and disputed issues of material fact. *Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co.,* 210 F.3d 18, 31 (1st Cir.2000); *See Bunch v. W.R. Grace & Co.,* 555 F.3d 1, 3 n. 4 (1st Cir.2009).

#### 1. The Arbitrary and Capricious Standard

■ In the mine run of ERISA cases, "trial is usually not an option: in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the rec-

ord compiled before the plan fiduciary." *Leahy v. Raytheon Co.,* 315 F.3d 11, 17–18 (1st Cir.2002). Where, as here, an ERISA disability plan "grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is 'arbitrary, capricious, or an abuse of discretion.'" *Wright v. R.R. Donnelley & Sons. Co. Group Benefits Plan,* 402 F.3d 67, 74 (1st Cir.2005) (quoting *Doyle v. Paul Revere Life Ins. Co.,* 144 F.3d 181, 183 (1st Cir.1998)).

■ "The operative inquiry under arbitrary, capricious or abuse of discretion review is 'whether the aggregate evidence ... could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits.'" *Wright,* 402 F.3d at 74 (quoting *Twomey v. Delta Airlines Pilots Pension Plan,* 328 F.3d 27, 31 (1st Cir.2003)). This Court must uphold the administrator's decision if it was "reasoned and supported by substantial evidence." *Stamp v. Metro. Life Ins. Co.,* 531 F.3d 84, 87 (1st Cir.2008) (quotation marks and citation omitted). "Evidence is substantial if it is reasonably sufficient to support a conclusion...." *Gannon v. Metropolitan Life Ins. Co.,* 360 F.3d 211, 213 (1st Cir.2004). Further, "[e]vidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision." *Wright,* 402 F.3d at 74 (citing *Gannon,* 360 F.3d at 213). Finally, review is limited to the evidence contained in the administrative record. *Liston v. Unum Corp. Officer Severance Plan,* 330 F.3d 19, 23 (1st Cir.2003).

#### 2. *Metropolitan Life Insurance Co. v. Glenn* and the Conflict of Interest Where Plan Fiduciary Is Both the Insurer and Administrator

The arbitrary and capricious calculus, as it applies to the denial of benefits under

ERISA, was altered by last term's United States Supreme Court decision in *Metropolitan Life Insurance Co. v. Glenn,* — U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Prior to *Glenn,* in the First Circuit, "the fact that ... the plan administrator will have to pay [a] claim out of its own assets d[id] not change the arbitrary and capricious standard of review." *Denmark v. Liberty Life Assurance Co. of Boston,* 481 F.3d 16, 29 (1st Cir.2007) *reh'g granted, opinion withdrawn* 530 F.3d 1020 (1st Cir.2008) (citations, quotation marks, and punctuation omitted) (directing the parties to rebrief the appeal "in light of" *Glenn* ).

In *Glenn,* the Supreme Court adopted the contrary position, holding that where an ERISA plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket ... this dual role creates a[n inherent] conflict of interest." *Glenn,* 128 S.Ct. at 2346. Where such a conflict exists, "a reviewing court should consider that conflict as *a factor* in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend on the circumstances of the particular case." *Id.* (emphasis added). The Supreme Court was careful to emphasize that its decision would not "change ... the *standard* of review ... from deferential to *de novo* review," *id.* at 2350 (emphasis in original), or "create special burden-of-proof rules, or other special procedural or evidentiary rules," *id.* at 2351. But, where a conflict of interest exists, "any one factor [including the conflict of interest] will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.* at 2351.

In applying its rule to the record in *Glenn,* a record devoid of any overt evidence that the conflict of interest influ-

enced the administrator's decision-making, the Court wielded the inherent conflict as a factor that magnified the arbitrariness of administrator's objectively inconsistent positions, rather than as a factor with independent weight. *Id.* at 2352 (stating that the Court of Appeals was justified in giving more weight to the conflict "because [the administrator]'s seemingly inconsistent positions were ... financially advantageous"); *see Christie v. MBNA Group Long Term Disability Plan,* No. 1:08–cv–44–JAW, 2008 WL 4427192, at *3 (D.Me. Sept. 25, 2008) (interpreting *Glenn* as holding that "to the extent that the bases for [the administrator's] decision are of dubious quality or present only an evenly balanced picture, this structural conflict may suffice to tip the scales in [the plaintiff's] favor"). The Court refused to adopt any rigid analytical formula, reiterating that "the reviewing judge should take account of [the conflict of interest] as a factor in determining the ultimate adequacy of the record's support for the" insurer/administrator's decision to deny benefits. *Id.* at 2352.

In the instant case, USIC is both the insurer and administrator of Colby's long-term disability insurance plan. Thus, with *Glenn* in mind, the following analysis applies the arbitrary and capricious standard of review, taking into account USIC's conflict of interest as one factor, among many.

**B. USIC's Decision to Terminate Dr. Colby's LTD Benefits Was Arbitrary and Capricious.**

Dr. Colby contends that USIC's termination of her benefits was arbitrary and capricious for a wide range of reasons, including that it classified Dr. Colby's occupation as a physician (as opposed to an anesthesiologist), evaluated Dr. Colby's illnesses in isolation from one another, minimized or ignored the opinions of Dr. Col-

by's treating physicians and independent medical examiners, relied primarily (if not exclusively) on its paper reviewers' opinions, and dismissed Dr. Colby's self-reported symptoms. Despite Dr. Colby's protestations to the contrary,[5] however, her claim for benefits hinges entirely on her primary argument: that USIC acted arbitrarily and capriciously by excluding categorically her risk of relapse into opioid abuse from its analysis of her claim. No one—no doctor, no treatment provider, not even Dr. Colby—has suggested that as of November 20, 2004, Dr. Colby's back pain and mental illnesses, excluding drug addiction, rendered her unable to perform at least one of the material duties of her occupation. Thus, risk of relapse constitutes the arch stone of Dr. Colby's claim, and the Court devotes the bulk of its discussion to that issue.

### 1. The Relevant Provisions of the Plan

Although USIC's Plan utilizes three potential tests to determine if an insured is disabled, all parties agree that only the Occupation Test applied to Dr. Colby's claim. Under the Occupation Test, a person is entitled to LTD benefits if "[d]uring the first 36 months of a period of disability (including the qualifying period), an injury, sickness, or pregnancy requires that [the claimant] be under the regular care and attendance of a doctor, and prevents [the claimant] from performing at least one of the material duties of [his or her] regular occupation." US 6.

The term "sickness" is not further defined, but the remainder of the Plan makes clear that sickness includes physical sickness and mental illness. "Mental illness," as defined by the Plan, means any "mental disorder . . . listed in the current edition of the Diagnostic and Statistical Manual of Mental Disorders [the DSM–IV], as published by the American Psychiatric Association." US 8. A number of mental illnesses are excluded from coverage, but none of the excluded diagnoses apply to Dr. Colby. *See* U.S. 7–8.

"Material duty or material duties" is defined as

> [t]he set or tasks or skills required generally by employers from those engaged in an occupation which cannot be reasonably accommodated. We will consider one material duty of your regular occupation to be the ability to work for an employer on a full-time basis as defined by the policy. However, if a material duty of your regular occupation is to work more than 40 hours per week, we will consider you able to perform that material duty if you have the capacity to work at least 75% of those hours per week.

US 8 (emphasis added).

### 2. USIC's Categorization of Dr. Colby's Occupation as a Physician Was Reasonable.

■ Before delving into the central issue of this case, the Court must first dispense with a threshold concern raised by Dr. Colby. Dr. Colby argues, albeit only in her statement of facts, that USIC's classification of her occupation as a physician, as opposed to the more specific category of anesthesiologist, was arbitrary and capricious. In the vast majority of cases in which the parties dispute the classification of occupation, the disability plan is silent on the meaning of the term "regular occupation." *See, e.g., Lasser v. Reliance Standard Life Ins. Co.,* 344 F.3d 381, 385–

---

**5.** Dr. Colby argues that "risk of relapse is but one factor which precludes [her] from working." Dr. Colby's Mot. for Sum. J. at 11. As will be discussed more fully below, while it is true that her risk of relapse is only one factor, without risk of relapse, Dr. Colby's claim would fail as matter of law.

87 (3d Cir.2003). In contrast, Dr. Colby's Plan provides a relatively detailed and broad definition. A "regular occupation" is "the occupation in which [the claimant was] working immediately prior to becoming disabled." And an "occupation" is "a group of jobs in which a common set of tasks is performed; or which are related in terms of similar objectives and methodologies, and which may be related in terms of materials, products, worker actions, or worker characteristics." US 9.

Given the expansive definition of "occupation" in Dr. Colby's plan and Dr. Colby's failure persuasively to argue that her occupation should be classified as an anesthesiologist, USIC's assignment of physician as Dr. Colby occupation was not arbitrary and capricious. Anesthesiology falls within the broader "group of jobs"—physician—that meet the Plan's. definition of occupation.

Consequently, USIC's delineation of the material duties of Dr. Colby's occupation was also reasonable. The parties agree that Dr. Colby's job required her to work 60 to 90 hours per week. Thus, one of the material duties of Dr. Colby's occupation is to work at least 45 to 67.5 hours per week. The other job duties of a physician identified by USIC were the ability to:

(1) Review and evaluate medical records.

(2) Diagnose medical condition of patient.

(3) Express an opinion on or prescribe, diagnostic measures and treatment.

(4) Record and/or report on facts and findings.

US 1413. Dr. Colby does not suggest that her risk of relapse renders her unable to perform the physician specific duties other than the ability to work full time. The sole issue is whether any of her illnesses or sicknesses leave her unable to return to work 45 hours per week.

### 3. USIC Excluded Dr. Colby's Risk of Relapse Into Substance Abuse from Its Analysis of Her Disability.

█ The record of Dr. Colby's physical and mental impairments is voluminous and largely undisputed. Physically, all parties agree that Dr. Colby was diagnosed with degenerative disc disease at L5–S1. Similarly, there is no dispute that psychologically Dr. Colby suffered from opioid dependence, dysthymia, post traumatic stress disorder, and pain disorder. That all of the medical professionals who evaluated Dr. Colby's mental health, including USIC's consultants, concurred that Dr. Colby suffered from opioid dependence, a mental disorder plainly recognized in the DSM–IV, is of primary import.[6] Further, all three of USIC's letters either terminating Dr. COlby's benefits or denying her appeals admit that Dr. Colby suffered from opioid dependence. US 1402 (denial of second appeal); US 1414 (denial of first appeal); US 1448 (termination of benefits).

The record also contains substantial evidence that, viewing Dr. Colby's constellation of health issues collectively, her return to full time work as a physician posed a dangerously high risk of her relapsing into active abuse of Fentanyl or other opioids.

● Dr. Wilkerson, Dr. Colby's treating physician at Talbott, stated in his discharge

**6.** *See* U.S. 795 (Dell–Ross diagnosing Dr. Colby with "opioid dependence, in full remission"); US 815 (Dr. Wartenberg diagnosing Dr. Colby with "opioid dependence"); US 922 (Dr. Parmet diagnosing Dr. Colby with "substance abuse, chronic, continuous—opioid dependence, currently in remission");

US 941 (Dr. Wilkerson diagnosing Dr. Colby with "opiate dependency"); US 1382 (Dr. Neubauer diagnosing Dr. Colby with "opioid related addictive disorder" and "opioid dependence"); US 1389 (Dr. Jones recognizing that Dr. Colby had been diagnosed with opioid dependency).

summary, that "[i]t is recommended at this time that [Dr. Colby] not return to the practice of medicine for six months to allow her to continue to work on her recovery and stabilize her home situation." US 940. In the two treating physician reports Dr. Wilkinson submitted to USIC as part of Dr. Colby's claim for benefits, he stated that Dr. Colby could not return to work until "approved by monitor." US 1162.

● Records from Dr. Colby's therapist, Dell–Ross, indicated that Dr. Colby's concern about relapse was a topic at nearly every one of the monthly sessions held after Dr. Colby was discharged from Talbott. A summary of Dell–Ross' work with Dr. Colby, created for the purpose of Dr. Colby's first appeal, stated that "Dr. Colby is in a period of early recovery from opiate dependence and is vulnerable to relapse. She cannot have access to substances during this period." US 796. In perhaps the most cogent and comprehensive analysis of Dr. Colby's risk of relapse, Dell–Ross, in a letter she prepared for Dr. Colby's second appeal, stated that Dr. Colby could not "sustain adequate rest and exercise within a 60 hour work week to prevent that level of chronic back pain from recurring. Her access to opiates, then, combined with the usual and unusual stressors of everyday life and work *would make her relapse almost inevitable.*" US 190 (emphasis added). Dell–Ross added that:

> Dr. Colby continues to be vulnerable to relapse due to the confluence of her conditions, i.e. recurrent depression, PTSD, chronic physical pain and opiate dependence. The sum of these conditions in combination with her character traits and lack of sufficient emotional supports is greater than the specific disability of each diagnosis considered separately, as occurred in

the[ ] evaluations [conducted by USIC's physicians].

US 190.

● Nearly one full year after Dr. Colby completed treatment at Talbott, Dr. Wartenberg, an addiction specialist who examined Dr. Colby in person and reviewed all of Dr. Colby's records, found that

> Dr. Colby has clearly demonstrated opioid dependency and continues, in my opinion, to a reasonable degree of medical probability, to be *at risk for relapse* .... It is my belief to a reasonable degree of medical certainty that Dr. Colby is at *high risk of relapse should she return to the practice of anesthesia, or to any situation where she could access anesthetic opioids.* Dr. Colby's continued minimalization and denial put her, in my opinion, to a reasonable degree of medical certainty, at *an even greater risk of relapse if she returns to the practice of anesthesia.*

US 816 (emphasis added).

● Parker, an independent vocational expert who examined Dr. Colby's paper records and conducted a phone interview with Dr. Colby, concluded that Dr. Colby's "PTSD, Depression, Substance Dependence, and Dysthymic Disorder ... prevent Dr. Colby from performing the executive level requirements ... of the occupation of anesthesiologist.... It is this consultant's vocational opinion that she is currently disabled from the occupation of anesthesiologist."

US 827–28.

In terminating Dr. Colby's benefits, USIC chose not to rebut these opinions from doctors and specialists that Dr. Colby's risk of relapse rendered her incapable of returning to a full time work schedule. Instead, USIC categorically excluded Dr. Colby's risk of relapse into opioid abuse

from its analysis of whether she was disabled, explaining repeatedly that "the potential for relapse is not the same as current disability." US 1404 (denial of second appeal), 1414 (denial of first appeal); *see also* U.S. 1421 (Kimberly Myers, appeal administrator, concluding in response to Dr. Colby's first appeal, "Uphold denial— insured not disabled. not[sic] going back to work to prevent relapse is not a disability"). None of the doctors or USIC's claim handlers provide any explanation from medical research literature or the language of the Plan to support this categorical exclusion from the policy. Further, because USIC concluded that risk of relapse could not possibly be a disability, none of its reviewers even conducted an analysis of Dr. Colby's risk of relapse to determine whether it was sufficiently high to meet the Plan's definition of disability. Dr. Neubauer's assessment was particularly deficient in this regard. She plainly acknowledged that Dr. Colby suffered from opioid dependence, but dismisses its relevance by simply explaining that Dr. Colby has no symptoms of active substance abuse that prevent her from discharging the material duties of her occupation. Dr. Neubauer made no attempt to quantify the probability that Dr. Colby would relapse upon a return to work as a physician.

Having excised risk of relapse from its disability calculation, USIC concluded that Dr. Colby's other physical and psychological impairments did not prevent her from performing a material duty of her occupation.[7] Accordingly, it terminated her benefits. For this Court to uphold USIC's termination of Dr. Colby's benefits, it must find that USIC's decision to exclude risk of relapse as a factor was "reasoned and supported by substantial evidence."

### 4. The Terms of Dr. Colby's LTD Plan Do Not Permit USIC Categorically to Exclude Risk of Relapse into Drug Abuse as a Disabling Sickness.

"[S]traightforward language in an ERISA-regulated insurance policy should be given its natural meaning." *Burnham v. Guardian Life Ins. Co. of Am.*, 873 F.2d 486, 489 (1st Cir.1989). As discussed above, the explicit terms of Dr. Colby's Plan do not distinguish between physical and mental disabilities. In other words, an individual who becomes disabled be-

---

**7.** In conducting this analysis, USIC's conclusions were amply supported by substantial evidence. The record shows that although Dr. Colby suffers from degenerative disc disease, Dr. Colby generally was able to manage her back pain with a strict 2–3 hours per day exercises routine. While maintaining such a routine while working between 45 and 67.5 hours per week would undoubtedly be a challenge, there is no question that it is possible. The record contains evidence that Dr. Colby went skiing on at least two occasions during the winter following her discharge from Talbott. The record also shows that Dr. Colby suffered from back problems from as early as 2000, and thus was capable of working in her position as an anesthesiologist despite the daily pain she was experiencing. In sum, Dr. Colby's back pain did not prevent Dr. Colby from performing at least one of the material duties of her job as a physician. This conclu-

sion is discussed at length in Dr. Parmet, Dr. Smith, and Dr. Neubauer's reports conducted on behalf of USIC.

With regard to Dr. Colby's mental health, USIC does not dispute that Dr. Colby suffers from dysthymia, post traumatic stress syndrome, and pain disorder. USIC claims instead that Dr. Colby's mental illness (with the exception of her drug addiction), did not prevent Dr. Colby from working as a physician. The record shows that during Dr. Colby's time in inpatient treatment at Talbott, she requested and was given permission to cease taking anti-depressants. Since then, although Dr. Colby has continued to seek treatment from Dell–Ross, there is no evidence that Dr. Colby's mental illness has increased in severity such that Dr. Colby would be unable to perform the duties of her job. The reports by Dr. Jones and Dr. Neubauer amply cite their support for this conclusion.

cause of a mental illness is equally entitled to benefits as an individual who becomes disabled as a result of a physical illness. The Plan further establishes that any mental illness recognized in the DSM–IV can serve as the basis for a disability. The DSM–IV devotes nearly 100 pages to diagnoses for substance-related disorders, and a full nine pages to opioid-related disorders, including opioid dependence. *See* American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders (DSM–IV)* 175–273 (4th ed. 1994). That USIC granted Dr. Colby benefits for the time period she was receiving in-patient treatment for her drug addiction further belies any attempt by USIC to draw a distinction between the Plan's treatment of physical and mental impairments. Clearly then, under the Plan, disability resulting from opioid dependence is covered to the exact same extent as disability caused by any other physical or mental malady.

Without the ability to distinguish between physical and mental sicknesses, USIC's arguments for excluding risk of relapse collapse under their own weight. As discussed above, USIC's primary justification for denying Dr. Colby's claim was that "the potential for relapse is not the same as current disability." US 1404, 1414. At a theoretical level, there is a difference between an individual who cannot work because an injury or sickness makes it impossible, under any circumstances, for him or her to perform the material duties of his or her occupation, (i.e., a broken arm precluding a carpenter from working) and an individual who cannot work because an injury or sickness creates a dangerous risk that a return to work would result in serious sickness (i.e., coronary disease or drug addiction). Yet at oral argument and in its moving papers, USIC readily admitted that an individual suffering from a physical sickness, say coronary disease, who could literally perform

the tasks required of his occupation but whose return to work would create a dangerously high risk of a heart attack, would be covered by the Plan and receive disability benefits. USIC's Mot. for Sum. J. at 15 (explaining that a meaningful difference exists between "cases that involve physical conditions such as coronary disease [and] cases in which the risk was relapsing into drug dependency").

This admission is fatal to USIC's attempts to excise risk of relapse into drug addiction from the ambit of its policy. At the risk of belaboring the point, the terms of the Plan do not permit USIC to distinguish between physical and mental sicknesses that leave an insured disabled. Thus, if, as USIC admits, the Plan covers future risk of relapse resulting from physical sickness, the terms of the Plan require that future risk of relapse caused by mental illness, such as opioid dependence, be covered as well. Even recognizing the substantial discretion available to a plan administrator, the Court can not allow USIC to carve out an unwritten exclusion to its fairly bargained policy. Fabricating an exception out of whole cloth that contravenes existing terms and interpretations of the Plan is the very definition of arbitrary and capricious.

### 5. No Legal Doctrine Permits USIC to Exclude Risk of Relapse as a Disabling Sickness.

USIC seeks cover for its interpretation of the Plan from case law in other circuits holding that a plan administrator does not abuse its discretion by excluding risk of relapse into drug addiction from the policy's coverage. The issue is one of first impression in the First Circuit. Having reviewed the relevant case law, which admittedly is split on the issue, the Court rejects the faulty reasoning of those courts that approve the exclusion of risk of relapse, and joins other courts that recognize

risk of relapse into drug abuse, if supported by evidence in the record and not otherwise excluded by the terms of a policy, as a disabling sickness under a LTD plan.

USIC relies most heavily on the majority opinion in *Stanford v. Continental Casualty Co.,* 514 F.3d 354 (4th Cir.2008), the only circuit court treatment on either side of the issue. In that case, a nurse anesthetist became addicted to Fentanyl, enrolled three times into in-patient treatment facilities, and relapsed on two separate occasions. After the plaintiff completed his third addiction rehabilitation treatment, the plan administrator terminated disability benefits, explaining that " 'the policy does not cover potential risk' " of relapse. *Id.* at 356.

The Fourth Circuit, applying a less deferential arbitrary and capricious standard "in light of Continental's conflict of interest as insurer and administrator of the benefit plan," held that Continental's determination that a risk of relapse cannot constitute a disability was not arbitrary and capricious. "A doctor with a heart condition," the court explained,

who enters a high-stress environment like an operating room "risks relapse" in the sense that the performance of his job duties may *cause* a heart attack. But an anesthetist with a drug addiction who enters an environment where drugs are readily available "risks relapse" only in the sense that the ready availability of drugs increases his temptation to resume drug use. Whether he succumbs to that temptation remains his choice; the heart-attack prone doctor has no such choice.

*Id.* at 358 (emphasis in original). The court acknowledged a split of authority on the risk of relapse issue, but used that "widespread, thoughtful, and reasonable disagreement" as evidence that "reasonable minds can, and do, differ as to whether the risk of relapse renders an addict unable to perform the material and substantial duties of his work." *Id.* at 359. Thus, the court held that it is reasonable for the administrator to exclude a risk of relapse into drug use as a disability under a LTD plan. *See also Allen v. Minnesota Life Ins.,* 216 F.Supp.2d 1377, 1383–84 (N.D.Ga.2001) (same); *Laucks v. Provident Cos.,* No. 1CV971507, 1999 WL 33320463, at *6 (M.D.Pa. Oct. 29, 1999) (reaching the same conclusion under de novo review).

With all due respect to the Fourth Circuit, *Stanford*'s holding defies the nature of drug addiction and ignores the common language in LTD plans treating physical and mental disabilities on equal footing. As eloquently expressed by Judge Wilkinson in dissent, the *Stanford* reasoning necessarily

rest[s] on moral considerations of choice and temptation on the one hand, and medical considerations of physical inability on the other, neither of which are to be found in the language of a Plan that puts addiction squarely on all fours with other impairments. The moral and medical choices are not this court's to make. They belong to those who bargained for the Plan—and who have something at stake in it.

*Stanford,* 514 F.3d at 363 (Wilkinson, J., dissenting). Other cases in accord with the *Stanford* majority commit the same moralistic error of separating risk of relapse into physical sickness from risk of relapse into mental illness. *See Allen,* 216 F.Supp.2d at 1383 (granting summary judgment for insurance company because treating physician's opinion about plaintiff-anesthesiologist's inability to return to work grounded in "future potentialities rather than any present impediment" could not possibly satisfy the Plan's definition of disability); *Laucks,* 1999 WL

33320463, at *4 ("The plaintiff's contention virtually eliminates choice as an ingredient in [addiction]. Plaintiff is saying because of his addiction, he has no control over his ability to not use. The plaintiff's contention is flawed."). Because these cases unreasonably and illogically distinguish between the future risks inherent in physical and mental sicknesses, the Court rejects their reasoning and holdings.

The decisions recognizing that a risk of drug abuse relapse can satisfy a LTD plan's definition of disability are considerably more persuasive. Rather than entirely reject risk of relapse as a possible disabling sickness without any support from the language of a LTD policy, these cases focus on whether the evidence of the probability of a relapse is sufficiently high to justify a finding of disability. For example, in *Kufner v. Jefferson Pilot Financial Insurance Co.*, 595 F.Supp.2d 785, 797 (W.D.Mich.2009), a district court judge found that an insurance company's denial of disability benefits was arbitrary and capricious because it failed to account for the "extensive medical evidence" of the opioid-addicted doctor's risk of relapsing into substance abuse. Similarly, in *Royal Maccabees Life Insurance Co. v. Parker*, No. 98 C 50422, 2001 WL 1110489 (N.D.Ill. Sept. 20, 2001) *vacated on other grounds* 2003 WL 22019779, at *7 (N.D. Ill. Aug. 21, 2003), a court reviewing a denial of benefits *de novo* held that a risk of relapse

was a disability where five medical professional recommended that the plaintiff "not return to the practice of emergency medicine because of his chemical dependency coupled with his chronic depression." *Holzer v. MBL Life Assurance Corp.*, No. 97 Civ. 5834(TPG), 1999 WL 649004, at *6 (S.D.N.Y. Aug. 25, 1999), reached the same conclusion, finding in a non-ERISA case under the normal summary judgment standard, that a triable issue of fact existed as to whether an anesthesiologist was disabled, due to an "unacceptable risk of returning to a pattern of drug abuse," where his return "to the practice of anesthesiology .... would cause him to be constantly handling the drugs that were the source of his addiction." *See also Hellman v. Union Cent. Life Ins. Co.*, 175 F.Supp.2d 1044, 1048–50 (M.D.Tenn.2001) (same); *Brosnan v. Provident Life & Accident Ins. Co.*, 31 F.Supp.2d 460, 464 (E.D.Pa.1998) (same).[8]

Some of these cases also acknowledge the significant and obvious danger USIC's position poses to the health and welfare of claimants. "Forcing [a claimant] to relapse into drug addiction or lose [her] benefits would ... thwart the very purpose for which disability plans exist: to help people overcome medical adversity if possible, and otherwise to cope with it." *Stanford*, 514 F.3d at 362 (Wilkinson, J., dissenting). In the specific context of disabled medical providers, requiring physi-

---

8. Both Dr. Colby and USIC point the Court to Judge O'Toole's recent decision in *Price v. Disability, RMS*, 2008 WL 763255 (D.Mass. 2008), the only opinion within the First Circuit even tangentially to have addressed the risk of relapse issue. While relevant to the instant discussion, Judge O'Toole's decision does not squarely address the issue of whether risk of relapse can meet a definition of disability. He simply cites in a footnote to the majority and dissenting opinions in *Stanford*, stating that "whether a risk of addictive relapse alone can ever render one unable to perform all of the material and substantial

duties of one's occupation is a matter of some controversy." *Id.* at *17 n. 2. For the purpose of his analysis, Judge O'Toole "assum[es]", without holding, "that the risk that a recovering substance abuser may relapse would be sufficient to support a finding of total disability as defined in the Policy." *Id.* at *21. On the record before him, Judge O'Toole ultimately concludes that even if risk of relapse can constitute a disability, the plaintiff's evidence was insufficient to support that finding. *Price*'s legal treatment of the risk of relapse issue thus does not address directly the issue this Court must face.

cians who are at risk of relapsing into substance abuse to return to the workplace has the added danger of placing patients at risk. *Kufner*, 595 F.Supp.2d at 796 ("[D]efendant's denial of LTD benefits is based on the rather amorphous determination that plaintiff can and should work ... as a hospital anesthesiologist unless and until he has an actual relapse of his narcotics addiction. This position is untenable given the serious risk this poses to public health and safety, which the Court considers as an additional factor weighing against defendant's benefits determination.").

The logic of these drug addiction cases is strongly echoed in the context of heart conditions potentially exacerbated by future workplace stress. In *Lasser v. Reliance Standard Life Insurance Co.*, 344 F.3d 381, 390 (3d Cir.2003), *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1325 (11th Cir.2001), *Saliamonas v. CNA, Inc.*, 127 F.Supp.2d 997, 1001 (N.D.Ill.2001), and *McGuigan v. Reliance Standard Life Insurance Co.*, No. CIV.A. 02–7691, 2003 WL 22283831, at *9–11 (E.D.Pa. Oct. 6, 2003), the plaintiffs' treatment providers were unanimous that the plaintiffs' return to their stressful occupations would pose a substantial and dangerous increased risk of heart attack. Each of the courts accepted that future risk of harm could constitute a disability, and accordingly focused "on the probability of the future risk's occurrence" based on the specific facts of the case. *Lasser*, 344 F.3d at 391 n. 12. Where the risk was substantial and well-documented in the patients'

treatment records (as it was in all four cases), the courts held that it was arbitrary and capricious for the administrators to deny the claimants benefits. *See Levinson*, 245 F.3d at 1324 (finding that attorney with heart condition was disabled because the stress of returning to work full-time would "put him at risk for enhancing the progression of his heart condition"); *Saliamonas*, 127 F.Supp.2d at 1001 (holding that plaintiff's heart condition did not place him at "future risks" but "rather [at] a present risk"); *McGuigan*, 2003 WL 22283831, at *9 (finding plan administrators refusal to credit treating physician's conclusion that future stress in the workplace would place plaintiff at risk was arbitrary and capricious).[9]

Thus, rather than support USIC's position, the most persuasive case law reinforces the Court's determination that USIC acted arbitrarily and capriciously. It is clear, both from logic and experience, that some substance abusers will in fact have such strong attractions to their drugs of choice that they will be unable to return to their occupations without seriously risking their own and others' health and well-being. This is particularly true in Dr. Colby's case, where as a physician, she would be required to come in contact with her drug of choice. Denying benefits on the grounds that a LTD plan does not cover future risk generally or treats physical and psychological future risks differently, absent language allowing such distinctions, is arbitrary and capricious. The Court will not allow USIC to "engage[ ] in

**9.** For additional cases reaching the same conclusion in slightly different factual circumstances, *See Kent v. Provident Life & Casualty Ins. Co.*, 146 Fed.Appx. 862, 863 (9th Cir. 2005); *Clarke v. Aetna Life Ins. Co.*, 471 F.Supp.2d 463, 474 (S.D.N.Y.2007) (holding that evidence that a LTD claimant's return to a high-stress law firm would risk relapse into major depressive disorder was sufficient to

defeat summary judgment on grounds of lack of disability); *Jakway v. Unum Provident Corp.*, No. CV01–6753AHM(RZX), 2002 WL 31996043, at *2 (C.D.Cal.2002) (holding, on *de novo* review, that a risk of relapse into major depression posed by a return to work is sufficient to state a claim upon which relief could be granted).

a form of 'benefits Russian roulette' [placing] ... [Dr. Colby's] career and h[er] patients' lives at risk." *Kufner,* 595 F.Supp.2d at 796.

**6. The Suspension of Dr. Colby's License to Practice Medicine Does Not Provide An Alternative Ground Upon Which USIC Could Reasonably Deny Dr. Colby's Claim.**

■ Under the arbitrary and capricious standard, the Court would still be required to uphold USIC's denial of Dr. Colby's claim if another, independently sufficient ground existed for USIC's decision. USIC argues that Dr. Colby was unable to resume her career as a physician not because she suffered from a factual, health-related disability, but rather because a legal disability—the loss of her license to practice medicine—prevented her from returning to work. The case law regarding legal disabilities is not well-developed in the First Circuit. Decisions from other jurisdictions, however, generally are in accord that where a health-related disability, on its own, would make a return to work impossible, the existence of a legal disability, even one caused by the health-related disability, does not justify the denial of benefits. *See Massachusetts Mut. Life Ins. Co. v. Millstein,* 129 F.3d 688, 690–91 (2d Cir.1997); *Paul Revere Life Ins. Co. v. Bavaro,* 957 F.Supp. 444, 449 (S.D.N.Y. 1997). *Bavaro* lays out the operative standard particularly clearly:

> If [the claimant] demonstrates to the trier of fact that he is unable to work because of his mental and emotional problems then he is entitled to disability payments, despite the existence of his subsequent legal disability. If, however, the trier of fact believes that but for his legal disability he would be able to perform his occupation, then he is not entitled to disability payments.

957 F.Supp. at 449. The Court rules that Dr. Colby's claim for benefits rests adequately on claims of factual disability and not solely on her inability to practice medicine because of the loss of her medical license. Thus, the suspension of Dr. Colby's license does not present a reasonable alternative justification for USIC's termination of her benefits.

**C. Remedy**

**1. Remand to USIC for a Renewed Determination of Dr. Colby's Claim is Appropriate.**

■ Having concluded that USIC's denial of Dr. Colby's claim for benefits was arbitrary and capricious, the Court must fashion an appropriate remedy. "Once a court finds that an administrator has acted arbitrarily and capriciously ..., the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Cook v. Liberty Life Assurance Co. of Boston,* 320 F.3d 11, 24 (1st Cir.2003). In an ERISA case, retroactive reinstatement of disability benefits is appropriate where " 'but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits or where there [was] no evidence in the record to support a termination or denial of benefits.' " *Id.* (quoting *Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1163 (9th Cir.2001) (alterations in original, quotation marks omitted)). Although district courts have "considerable discretion," *id.* at 24, remand is less appropriate in some circumstances, such as when "a denial was particularly flagrant or where it is likely that once the plan administrator corrects the errors in its decision, the proper result will be again to deny benefits for some or all of the relevant period." *Radford Trust v. First Unum Life Ins. Co. of Am.,* 321 F.Supp.2d 226, 250 (D.Mass.2004) (citing *Cook,* 320 F.3d at 24.).

██ In the instant case, a remand to USIC for additional administrative proceedings consistent with the Court's Decision is appropriate. USIC acted arbitrarily and capriciously by interpreting the fairly bargained LTD policy in an unreasonable manner. Where a denial of a claim is based on an unreasonable interpretation of an ERISA policy's language, generally, the appropriate remedy is a remand to the plan administrator for a reevaluation under the proper interpretation. *See King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1005 (8th Cir.2005) (en banc); *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 460–61 (9th Cir.1996) ("[R]emand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination"). Because USIC categorically excluded risk of relapse as a basis for disability, USIC never conducted the appropriate analysis, i.e. whether the probability of Dr. Colby relapsing upon a return to the practice of medicine was so high that she could not perform a material duty of a physician. It is for the administrator, "not the courts, to make [the determination] in the first instance." *Saffle*, 85 F.3d at 460. Consequently, a remand is justified under the circumstances of this case.

### 2. The Court Awards Attorneys' Fees and Costs to Dr. Colby.

██ The Court also has within its discretion the authority grant Dr. Colby, as the prevailing party, attorneys' fees and costs. 29 U.S.C. § 1132(g)(1). The First Circuit has rejected a presumption in favor of awarding fees to a prevailing plaintiff in ERISA benefits cases. *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 226 (1st Cir.1996) ("We hold that, in an ERISA case, a prevailing plaintiff does not, merely by prevailing, create a presumption that he or she is entitled to a fee-shifting award."). Instead, the First Circuit has compiled a five factor test to help guide a district court's exercise of its discretion. *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 257–258 (1st Cir.1986). The factors that should be considered are:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

*Cottrill*, 100 F.3d at 225 (citing *Gray*, 792 F.2d at 257–58). This list of factor is instructive, not exhaustive. *Id.*

The Court holds that Dr. Colby shall receive attorneys' fees and costs. Under the first factor, USIC has not conducted itself in bad faith, but rather acted in accordance with a good faith, albeit unreasonable, interpretation of the terms of the Plan. That courts in other jurisdictions have read nearly identical policy language in the same way as USIC further supports a finding that USIC is not especially culpable.

The second factor is of negligible importance, for although USIC certainly has the financial resources to afford attorneys' fees and costs, "the capacity to pay, by itself, does not justify an award." *Id.* at 227 (holding that the second factor was intended primarily to limit the award of attorneys' fees against financially limited parties, not to encourage awards against the well-off).

It is the third factor that most justifies the award of fees in this case. Requiring USIC to pay fees will deter other LTD

plan administrators from discriminating between policy holders with physical and psychological impairments when such a distinction is not supported by the language of the policy. Rulings of this Court have held that the facially unequal treatment of physical and mental disabilities in LTD plans is actionable under the Americans with Disabilities Act, *See generally Fletcher v. Tufts Univ.*, 367 F.Supp.2d 99 (D.Mass.2005) (Lindsay, J.); *Iwata v. Intel Corp.*, 349 F.Supp.2d 135 (D.Mass.2004). Although Dr. Colby's claim arises in an entirely different context and her LTD Plan does not facially discriminate between physical and mental disabilities, USIC's conduct exhibits a tendency toward a similarly impermissible result. As such, the deterrent value of a fee award is considerable.

The fourth factor reinforces the third, in that policy holders benefit when plan administrators treat equally claims arising from physical and mental disabilities. To the extent the Court's order alters USIC's or other plan administrators' approach to claims of mental disability and drug addiction, in particular, all of USIC's policy holders stand to benefit.

Finally, the fifth factor narrowly favors Dr. Colby and the awarding of fees. Obviously, the Court ruled that Dr. Colby's position was more meritorious than USIC's; nonetheless, USIC ought not be faulted for taking a good faith approach to evaluating Dr. Colby's claim.

While only the third factor strongly supports a fee award, attorneys' fees and costs are still justified in this case. USIC had every opportunity to contest Dr. Colby's contention that her risk of relapse rendered her unable to perform a material duty of her occupation. Instead, USIC drew an unexplained line in the sand and erroneously refused to consider Dr. Colby's probability of relapsing into active drug abuse. As a result, Dr. Colby has incurred considerable cost and delay—more than four years and the filing of two administrative appeals and this federal lawsuit—simply to have USIC examine the full extent of her claim for disability benefits. Dr. Colby ought not be the party to bear the burden of remedying USIC's mistake. Consequently, the Court orders that USIC pay Dr. Colby reasonable attorneys' fees and costs incurred from July 26, 2005, the date USIC terminated Dr. Colby's benefits, until the present. The Court orders that the parties confer and, if possible, file a joint proposed order regarding the extent of attorneys' fees and costs that USIC will pay to Dr. Colby.

## IV. Conclusion

For the reasons stated, the Court GRANTS Dr. Colby's motion for judgment on the record [Doc. No. 15], DENIES USIC's cross motion for judgment on the record [Doc. No. 20], and enters Judgment for Dr. Colby as to Counts I and II of Dr. Colby's Complaint [Doc. No. 1]. Specifically, the Court orders that:

1. Dr. Colby's claim for long term disability benefits is remanded to USIC for additional proceedings consistent with this Opinion.

2. USIC shall pay Dr. Colby for the reasonable attorneys' fees and costs incurred from July 26, 2005, the date of USIC's termination of Dr. Colby's benefits, until the present.

SO ORDERED